**Elmer G. ABBOTT et al.,**

v.

**The UNITED STATES.**

No. 50208.

United States Court of Claims.

May 8, 1957.

See also 112 F.Supp. 801.

Francis P. Noonan and William S. Tyson, Washington, D. C., for the plaintiffs. Gaines V. Palmes, Washington, D. C., was on the briefs.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is a suit by ship pilots employed by the Panama Canal, an agency of the United States. They sue for overtime compensation at time and one-half their basic rates of pay for work in excess of 40 hours per week. The period covered by the suit is July 1, 1945 to July 1, 1951. The plaintiffs base their claim on section 203 of the Federal Employees' Pay Act of 1945, 59 Stat. 297, 5 U.S.C.A. § 913. At the present stage of the case, only the question of liability will be decided.

Section 203 said:

"Employees whose basic rate of compensation is fixed on an annual or monthly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose shall be entitled to overtime pay in accordance with the provisions of Section 23 of the Act of March 28, 1934 (U.S.C. 1940 edition, Title 5, sec. 673c)."

The Act of March 28, 1934, 5 U.S.C.A. § 673c, referred to in section 203, provided for time and one-half for work in excess of 40 hours per week.

The plaintiffs say that section 203 applied to them. The Government says it did not. The pilots' compensation was on an annual basis. The only additional question, then, is whether, before and during the period in question, their compensation was "adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose", within the meaning of section 203.

The pay of the pilots was set by the Governor of the Panama Canal, to whom the President had delegated that authority which had been granted to the President by statute. We held in Poggas v. United States, 93 F.Supp. 1009, 118 Ct. Cl. 385, that the Secretary of the Interior, in setting the wages of employees of the

Alaska Railroad, was acting as a "wage fixing authority" within the meaning of the 1934 Act, and we think the same is true of the Governor of the Panama Canal in this case.

Did the Governor adjust the pilots' pay from time to time in accordance with prevailing rates? Our findings show in minute detail the processes by which the Governor, on numerous occasions, arrived at his conclusions as to their pay. In 1919 he acted on the recommendation of the Wage Board which then and since then has advised him on questions relating to the pay of most of the mechanical employees of the Canal. In 1927 he corresponded with the Comptroller General of the United States as to his power to set certain wages for pilots. In 1928 he took the advice of a "Salary Board" appointed by him. In 1939 the Special Assistant to the Governor made a study for him. In 1941 the Chief of the Research and Service Bureau of the Canal prepared a memorandum for the Personnel Director on the question. Also in 1941 the Governor appointed a Special Committee of high officials of the Canal to make recommendations to him. In 1945 he appointed a committee to review the provisions of the Federal Employees Pay Act of 1945, 5 U.S.C.A. § 901 et seq. and its effect on pay rates of Canal employees. That committee made recommendations as to the pay of the pilots, among others, and the Governor followed some of its recommendations. In 1946 and 1948 he granted increases to the pilots corresponding to the percentage increases granted by Congress to classified employees. In 1948 he appointed a Special Board to consider pilot pay rates, and took the action which the Board recommended. On May 27, 1951, the Governor adopted a pay schedule for the pilots based on the salaries paid masters of ocean-going vessels as fixed in wage agreements between the shipping companies and the union of masters, mates and pilots.

It is apparent from the foregoing that the Governor made his decision as to the pilots' pay after receiving information and advice. This is, we suppose, what is done by the responsible head of any agency which employs persons whose pay is not fixed by statute. We suppose that, even if he has a regular "Wage Board" he is not bound to follow exactly its recommendations.

The Government says that the Governor, acting as a wage-fixing authority, did not fix the pilots' wages "in accordance with prevailing rates", which is the language of section 203. The "prevailing rates" would have seemed to be those which pilots received in United States ports. The Governor was early advised that pilots in United States ports had formed closed associations and had obtained monopolies from the States concerned. The associations, the Governor was advised, overcharged the shipping companies for the services of their members, and divided the income of the associations among the members, giving them incomes excessively high for the value of the work. Such incomes to the Panama Canal pilots would have put their pay above that of the officials of the Canal, and completely out of line with the general pay scale of the Canal. When the pilots urged that their pay should be that of masters of ocean-going vessels, it was urged in opposition that such masters had much greater administrative responsibilities for crew and cargo and were required to be absent from home for long periods.

The abnormal monopolistic situation of the pilots in American ports, as reported to the Governor, made it difficult for him to apply directly the usual measure of prevailing rates. His advisors did, however, consider all the data that were presented to them about the pay for reasonably comparable services in the maritime field, and gave weight to that evidence in making their recommendations. They also considered the duties and responsibilities of the position, the training and education required, and the character of the services performed. They sought to preserve a reasonable correlation between the pay of the pilots and that of other employees of the Canal

such as masters of dredges and other floating equipment.

■ It seems to us that, in the circumstances, the Governor did fix the pilots' pay "in accordance with prevailing rates" within the meaning of section 203. The income of pilots in the United States not being, in his opinion, a practically usable measure, his advisers looked to other lines of comparable maritime work, and the wages paid for it. Since that work was not identical, but only comparable, the rates of pay for it could not be directly used to fix the pay of the pilots. If the Government carries on an enterprise which has no exact counterpart in private industry, a wage-fixing authority must necessarily use comparisons and analogies in fixing wages in the unique Government enterprise, if it has the duty of setting a fair and competitive wage. We therefore conclude that section 203 was applicable to the plaintiffs.

The Government urges that the pilots belonged to a profession, rather than to a trade or occupation, and were, therefore, not within the scope of section 203. That section does not mention either trades and occupations, or professions, but the Government argues that, since section 23 of the 1934 Act, referred to in section 203, did speak of "the several trades and occupations" in connection with the setting of pay rates by wage boards, the same limitation is implied in section 203. We see no reason for the implication, but if we were to adopt the implication, it would not affect our conclusion. A skill such as that of these pilots, which one learns almost entirely by working at it, and not by academic study, is not what is commonly understood as a profession.

The Government urges *laches* and *res adjudicata* as reasons for rejecting the plaintiffs' claims. We have considered the Government's contentions in these regards, and do not find merit in them.

■ In further proceedings the plaintiffs will prove how much time they worked in excess of 40 hours per week. But in the instant stage of the case we have two special problems as to whether certain time spent by them was working time and therefore compensable.

The pilots are required to be available at designated hours for piloting vessels. The usual procedure is that a telephone call to the pilot before 8 a.m. advises him that he will be picked up by a Canal vehicle at a designated time, which time may be several hours later. In the meantime he may do as he pleases, where he pleases, so long as he is available to be picked up at the designated hour. The plaintiffs say that the time between the notification and the pickup time is compensable time. We think not. Whatever one's working hours may be, he cannot do what he pleases in the hours before he goes to work, unless what he pleases to do can be completed in time for him to get to work on time. It may be inconvenient and disrupting to have irregular hours of work, as the pilots have, but section 203 makes no provision for that.

After a pilot has taken a ship through the Canal, he travels back across the Isthmus to his starting point. He is credited with an arbitrary amount of time, 2⅓ hours, for this return trip, unless either, (1) the trip is made on the pilot's day off or (2) the pilot has already worked 40 or more hours in the week in which the return trip is made. No matter when the return trip is made, it is made in the employer's train or vehicle, without cost to the pilot. The plaintiffs do not question the adequacy of the 2⅓ hour allowance. They claim, however, that they should receive compensation for all their return trips, including the ones for which they are not now compensated.

It may be that if one has the job, for example, of delivering automobiles by driving them to the purchasers' places of business in distant cities, he could, without violating laws such as the Fair Labor Standards Act, 29 U.S.C.A. § 201, et seq., agree with his employer that his time should stop when he made the delivery, and he would get back to his

starting point on his own time and expense. But if the parties agreed that his return time should be working time and compensable, unless it constituted overtime, in which case it should not be working time nor compensable, we think that they would have drawn a distinction which had no logical basis, and could serve only to evade the standards of the law. So we think that here the Panama Canal has by its practice of paying for it, defined the time of the return trip as working time. Since that time is used for the same purpose in the cases in which the employer does not pay for it as in the cases in which it does pay for it, we conclude that the plaintiffs are entitled to be paid for the return trip, even though the return occurs on their day off, or after they have worked 40 hours.

The defendant is liable to the plaintiffs, and the plaintiffs are entitled to a judgment to that effect. The amount of recovery, if any, will be determined in further proceedings pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.