**L. M. DANIELS and Clayton G. Leonard**
**v.**
**The UNITED STATES.**
**No. 241–67.**

United States Court of Claims.
March 14, 1969.

S. Perry Penland, Jacksonville, Fla., attorney of record, for plaintiffs. James Handly, Jr., Jacksonville, Fla., of counsel.

Mary M. Schroeder, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

COLLINS, Judge.

Plaintiffs, civilian employees of the Department of the Navy, have been working during the claim period as ships' pilots in the Mayport-Jacksonville, Florida, area. Plaintiffs assert that since May 1, 1959,[1] the Navy Department, acting pursuant to the Classification Act of 1949,[2] has arbitrarily fixed their salary rates. On the undisputed facts before us, we find for defendant.

The instant controversy centers around a study conducted in 1959 by the Navy's Office of Industrial Relations. It is clear that plaintiffs' pay from May 1, 1959, was based upon the findings and recommendations of the report [3] resulting from that study.

During the period in question plaintiffs' salaries were determined by applying a formula of 70 percent to the base pay for a 40-hour week of a Class A Ship's Master in the Military Sea Transportation Service (MSTS). It is contended that plaintiffs' functions and duties bear no relation to those of a MSTS Ship's Master. The appropriate salary bases, plaintiffs allege, were instead the rates of pay of non-Government pilots in the same area. It is asserted that plaintiffs' pay is not equivalent to that received by similarly qualified and licensed pilots performing similar duties for private enterprise in the Mayport-Jacksonville vicinity.

According to the petition, plaintiffs spend approximately 65 percent of their time working as bar pilots [4] and the remaining 35 percent of their time functioning as docking pilots.[5] Plaintiffs assert that this ratio applied to the pay of pilots employed by private enterprise is

---

1. In its motion, defendant argues that, regardless of the merits, plaintiffs' claims for periods prior to July 24, 1961, are barred by the statute of limitations, 28 U.S.C. § 2501 (1964). The petition was filed on July 24, 1967. As plaintiffs admit in their cross-motion, defendant's position is clearly correct. Burich v. United States, 366 F.2d 984, 177 Ct.Cl. 139 (1966), cert. denied, 389 U.S. 885, 88 S.Ct. 152, 19 L.Ed.2d 182, rehearing denied, 389 U.S. 998, 88 S.Ct. 486, 19 L.Ed.2d 504 (1967).

2. 63 Stat. 954 (1949), as amended, 5 U.S.C. § 1082 (1964), recodified as 5 U.S.C. § 5342 (Supp. II, 1965–66).

3. NAVY DEPARTMENT, OFFICE OF INDUSTRIAL RELATIONS, WAGE AND CLASSIFICATION DIVISION PROJECT No. 167: Development of a Pay-Fixing System for the Navy's Maritime Service (Mar. 12, 1959). Hereafter, the study will be cited as "PROJECT," with numerical reference to the page numbers of the report.

4. Bar piloting refers to the practice of guiding a ship from the open sea (beyond the bar) into the harbor, or from the harbor out to sea (clear of the bar) (PROJECT 7).

5. Docking pilots are responsible for maneuvering a ship from the stream into a dock, or from a dock into the stream. Shifting a ship from one point to another within the harbor may also be the responsibility of a docking pilot (PROJECT 7).

the proper formula to be used in fixing their salaries.

█ Section 1082 (now 5342(a)) of the Classification Act as codified provided the Navy's authority to set pilots' salaries.

> This chapter * * * shall not apply to—
>
> * * * * * *
>
> (8) officers and members of crews of vessels, whose compensation shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry;
>
> * * * * * *

It is not disputed that plaintiffs fall within the class, "officers and members of crews of vessels." Plaintiffs have recognized, as has this court (Adams v. United States, 141 Ct.Cl. 133 (1958)), that the stated provision vests the Secretary of the Navy with great discretion in setting wages. It is his administrative responsibility to determine how closely the salaries of the specified personnel can parallel the maritime industry's rates and still be "consistent with the public interest."

█ Because of the broad congressional grant of administrative discretion, the scope of this court's review is limited. As the Supreme Court has stated concerning an analogous delegation of authority,

> * * * More than a half-century ago this Court declared that "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong." * * *

United States v. Shimer, 367 U.S. 374, 381–382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). This court expressed similar sentiments when discussing the above-quoted portion of the Classifica-

tion Act in Adams v. United States, *supra,* 141 Ct.Cl. at 134: "Authority to fix wages was vested in the Secretary of the Navy, and not in this court." *See* Abbott v. United States, 151 F.Supp. 929, 138 Ct.Cl. 459 (1957); *cf.* Crawford v. United States, 376 F.2d 266, 273, 179 Ct.Cl. 128, 140 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968).

█ It should be clear from the cited authorities that this court will not purport to tell the Secretary of the Navy what salary formula and base he should adopt. Our concern is simply to determine whether plaintiffs have met their heavy burden of proving that the Secretary's action in this instance was so arbitrary as to be clearly wrong. This they have failed to do.

A reading of the Navy's report convinces us that the in-depth paper was carefully prepared and that the conclusions reached were quite plausible. For some years prior to 1959 pilots' salaries were set on a regional basis by means of complicated formulae (Project 17, 20). The result was a wide and unjustified salary variance from area to area, occasioning petty jealousies, disproportionate administrative expense, and requests for reform from the pilots themselves (Project 16–24). After an assimilation of the accumulated data and opinions from all interested parties, the report concluded that a uniform national salary rate should be established (Project 21–24, 35). In order to determine the "prevailing rates and practices in the maritime industry," the report examined the functions, duties, and pay structures of all pertinent classes of pilots, in Government service and outside it (Project 7–16, 30–34). It was found that no adequate salary formula could be established upon a classification of the relative functions, experience, and qualifications of the pilots, since most pilots performed or were qualified to perform the same duties to a greater or less degree (Project 7–8). In addition, the report determined that Navy pilots had no exact counterparts in the maritime industry (Project 35).

Specifically, in regard to the salaries of pilots working for private enterprise, it was found that typically pilotage fees and licensing were regulated by state law. The so-called "state pilots" operated through local associations conducted as partnerships with state authorization. Since the income of the association was shared jointly by the member pilots, the membership was limited and the pilots were typically on duty or standby as much as 80 hours per week. Because the associations would not readily reveal their earnings, the report concluded that there was no adequate basis to determine what salaries the state pilots received, but estimated that the average salary range was between $15,000 and $17,000. The suggestions that such pilots generally made $20,000 to $30,000 were considered to be exaggerated (Project 8–11, 30). Regardless of what earnings the state pilot received, however, the report emphasized the following distinguishing features: (1) Unlike the Navy pilot, the state pilot is the owner-operator of a business; (2) the state pilot will usually have undergone a long apprenticeship at nominal salary; (3) he is in duty status for about 80 hours per week; (4) fringe benefits, if any, are provided at the expense of the association; and (5) the state pilot specializes in bar piloting and is continually subject to the hazards and discomforts of that occupation (Project 10–11).

We note that in Abbott v. United States, 151 F.Supp. 929, 931–932, 138 Ct. Cl. 459, 462–463 (1957), a case involving the setting of pilots' salaries by the Governor of the Canal Zone, this court found that the rejection (for reasons similar to those given in the instant report) of state pilots' salaries as a basis for fixing the pay of Government pilots was not arbitrary.

█ Plaintiffs have attached to their motion three affidavits executed by pilots working in the Mayport-Jacksonville area to show that the prevailing salaries in the maritime industry for a 40-hour week exceeded the pay received by Navy pilots. Defendant controverts these affidavits, but even if we take them as true, plaintiffs still cannot prevail. Plaintiffs' entire theory of recovery is predicated upon the situation that existed in the Mayport-Jacksonville vicinity. They have not attacked as arbitrary the Navy's *choice* of a national uniform salary scale, except indirectly through showing that the application of the rates in the particular area resulted in unequal treatment. Nor have plaintiffs offered or attempted to show that the use of the scale caused a *universally* wide difference between the salaries prevailing in the maritime industry and those paid by the Government. A showing of a regional salary difference without more is insufficient to prove that the Secretary's choice and use of the nationally applied salary rate was arbitrary and inconsistent with his statutory duty.

█ Plaintiffs further contend, however, that the use of the pay of a Class A Ship's Master, MSTS, as a salary base for Navy pilots is arbitrary because of the noncomparability of the duties of masters and pilots. The report tacitly admits that the two jobs are not comparable, but further states that—in the absence of any comparable base—it was necessary to select some position within the marine industry upon which to found the salary rate. This conclusion was reached, however, only after a careful consideration and rejection of the various pilot salaries that could be used as a base (Project 30–36). The important point, moreover, is that the *amounts* paid to non-Navy pilots in accordance with prevailing industry rates were calculated without reference to the position of Ship's Master. It was only after the pilots' salary range was determined in light of industry practice that the search for a base settled upon the master's position. It is therefore seen that the pay of Navy pilots was related directly to the salaries paid other pilots, and the use of the master's position as a base was merely a matter of administrative and mathematical convenience.

For the above reasons, we find that the action taken by the Navy in fixing plain-

tiffs' salary rates was not arbitrary. Accordingly, defendant's motion for summary judgment is granted, plaintiffs' cross-motion is denied, and the petition is dismissed.