Harold P. ROGERS, George A. Greenfield, Jr., Robert E. Latimer, Jr., Clyde R. Siler, Leonard A. Dinger, Plaintiffs,

v.

Melvin E. LAIRD, Secretary of Defense, Paul R. Ignatius, Secretary of the Navy, and the United States of America, Defendants.

Civ. A. No. 6440.

United States District Court, E. D. Virginia, Norfolk Division.

Sept. 14, 1970.

**2**

Stanley E. Sacks, Norfolk, Va., for plaintiffs.

Harland F. Leathers, David J. Anderson, Dept. of Justice, Washington, D. C., W. T. Mason, Jr., Asst. U. S. Atty., Norfolk, Va., William McL. Ferguson, Harry H. Holt, Jr., Gen. Counsel, Newport News Shipbuilding & Dry Dock Corp., Newport News, Va., for defendants.

## OPINION AND ORDER

KELLAM, District Judge.

Plaintiffs are blue-collar supervisors employed by the United States at the Norfolk Naval Shipyard (Shipyard). They instituted this class action on behalf of themselves and all members of the National Association of Supervisors, Chapter 3, seeking money and injunctive relief. They contend that the provisions of the statutes under which wage rates are established for Navy blue-collar employees have not been complied with.

The interpretation and application of the statutes is the question. Title 10, § 7474 U.S.C.A., effective prior to September 1966, provided:

> The Secretary of the Navy shall establish rates of wages for employees of each naval activity where the rates are not established by other provisions of law to conform, as nearly as is consistent with the public interest, with those of private establishments in the immediate vicinity.

The pertinent part of Title 5, § 5341, effective since September 1966, provides:

> (a) The pay of employees excepted from Chapter 51 of this title by section 5102(c) (7) of this title shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates. Subject to section 213(f) of title 29, the rates may not be less than the appropriate rates provided for by section 206(a) (1) of title 29.

To comply with the statutes, the Navy initiated "wage surveys" under regulations and procedures formulated by it. Plaintiffs say the surveys were improper in that they did not (a) review or compile the wages of persons doing substantially the same work or having the same responsibilities as plaintiffs; (b) the surveys were not taken in similar industries [1]; and (c) the Navy set an arbitrary differential in determining the pay of plaintiffs over the tradesmen they supervise. Plaintiffs further complain that supervisory personnel were not utilized in making the wage survey.

The fixing of a supervisory pay schedule was a source of difficulty with the Navy. It had for many years been based on a "cents-per-hour" differential, which decreased in percentage as the mechanic's hourly rate increased. After a rather exhaustive study of the Navy's prior practices, studies made of private industry, and surveys then conducted by the Navy, it was determined that the fair and proper system to be used was a self adjusting type system. Under such a system it would not be necessary to continually "change the differentials." These studies led to the determination that the "first level of supervisory differential should be 25 per cent," and then it "built the rest of the structure on that." Such a plan was adopted about 1952. The National Association of Supervisors was consulted about the plan, and were generally "favorably disposed toward it." The self adjusting feature "was a great improvement over the straight cents-per-hour system." In the study in 1952 and subsequent there-

---

1. Plaintiffs say the only similar industry in the area of the Norfolk Naval Shipyard is Newport News Shipbuilding and Dry Dock Corporation.

to, the Navy has found it most difficult to obtain pay rate information of comparable supervisory jobs. The tables of organization of the Navy and private industry were and are quite different. Hence the Navy took its differential established for the first level and built upon that. The validity of the percentages differential is checked periodically and altered or changed following surveys and studies. Since the supervisor's pay is based on a percentage of pay of the persons he supervises, the pay of all supervisors is not the same. That is, a supervisor of machinists makes more than a supervisor of laborers. His training, knowledge, experience and work is quite different, and while his percentage of differential is the same, the pay is different because a machinist earns more than a laborer.

The classification of employees at the Navy Yard is rather detailed. For instance, within the supervisory levels there are three step ranges, and in the ranking of trades for mechanics there is a level system extending from 1 to 15 based on skill and responsibility.

Mechanics' wages are set by local wage surveys in each area in which the Navy has employee population. In collecting wage information, surveys are made of (a) "major competitors for that classification of people," and (b) "jobs in which there is a heavy representation in private industry." In such surveys, selections are made of 25 to 35 jobs which are "representative of a community's wage structure," and of companies that are essentially the same kind of industry as the Navy. A full scale survey is conducted every three years, and a wage-change survey conducted every year between. Such surveys have resulted in an annual increase in wages for the past twenty-five years. Such plan is Navy-wide throughout the United States, affecting some 200,000 blue-collar workers. The plan used by the Navy is used by others. In the Tidewater Area it is used by the Shipyard, Naval Air Rework Facility, Naval Station, Naval Amphibious Base, Naval Ammuni-

tion Facility at Yorktown, St. Julien's Creek, Naval Supply Center, Public Works Center, Naval Hospital, and all the activities in the area. It is necessary to prevent competition between activities. A differential in machinists' pay at the Shipyard and at the Air Rework Facility would bring about difficulty. In all probability the machinist would want to transfer to the facility with the highest pay, depriving the lower pay facility of its needed employees.

While wage surveys were successful in getting information on non-supervisory rates, because they were often the subject of collective bargaining agreements, difficulty was experienced in obtaining information on supervisory rates. In fact the Navy has had little success in obtaining this information from Newport News Shipbuilding and Dry Dock Corporation (Newport News Ship), the largest private shipbuilder in the Tidewater Area.

The expert witness, Dr. Gordon, who testified for plaintiff, says that fixing pay of supervisory personnel at a percentage above the pay of the people he supervises is used in industry, but he says it is not the best practice. Mr. Gerow, the expert for defendant, says such a system is widely used in industry, and is an accepted practice. Mr. Gerow's experience, training and knowledge are extensive. His reasoning was sound. I prefer to accept his opinion on the issue.

A classification of positions, responsibilities, and number of persons supervised by the Shipyard is attached as Appendix "A", and a similar chart for the Newport News Ship is attached as Appendix "B". From these it will be seen that the table of organization for each facility is quite different. An attempted comparison is difficult, and would be of little help.

The wage rates for supervisors are no longer set by the Navy. The Civil Service Commission now has general authority for establishing guidelines and proce-

**4**

dure to be used in wage fixing under the Coordinated Federal Wage System. The purpose is to establish a single wage system for ungraded employees of the government. The plan has been given great study over a long period. The coordinated pay system will use a percentage differential system in paying Navy blue-collar supervisors.

■ In each of the statutes here under consideration the pay of employees is to be fixed and adjusted, from time to time, "as nearly as is consistent with the public interest," to conform "with those of private establishments in the immediate vicinity" prior to 1966, and since September 1966 "in accordance with prevailing rates." Of primary concern in each of the statutes was "the public interest." Congress has delegated to the Executive Branch great discretion in fixing the wages of its employees. Any review by the Court of actions taken by the Executive Branch is and should be very limited. Under no circumstances should the Court undertake to substitute its judgment. The right of review by the Court is limited to whether the Navy has (a) exceeded its authority, or (b) its action is clearly wrong.

The Supreme Court said in United States v. Shimer, 367 U.S. 374, at 381, 81 S.Ct. 1554, at 1560, 6 L.Ed.2d 908:

* * * More than a half-century ago this Court declared that "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong." Bates & Guild Co. v. Payne, 194 U.S. 106, 108–109 [24 S.Ct. 595, 597, 48 L.Ed. 894]. This admonition has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. See e. g., National Broadcasting Co. v. United States, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344]; Labor Board v. Hearst Publications, Inc., 322 U.S. 111 [64 S. Ct. 851, 88 L.Ed. 1170]; Republic Aviation Corp. v. Labor Board, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372]; Securities & Exchange Com'n v. Chenery Corp., 332 U.S. 194 [67 S.Ct. 1575, 1760, 91 L.Ed. 1995]; Labor Board v. Seven-Up Bottling Co., 344 U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377].

And again in Udall v. Tallman, 380 U.S. 1, at page 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Unemployment Comm'n v. Aragon, 329 U.S. 143, 153 [67 S.Ct. 245, 91 L.Ed. 136]. See also, e. g., Gray v. Powell, 314 U.S. 402 [62 S.Ct. 326, 86 L.Ed. 301]; Universal Battery Co. v. United States, 281 U.S. 580, 583 [50 S.Ct. 422, 74 L.Ed. 1051]. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'" Power Reactor Co. v. Electricians, 367 U.S. 396, 408 [81 S.Ct. 1529, 1535, 6 L.Ed.2d 924].

When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.

"Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt * * * [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock Co., 325 U.S. 410, 413–414 [65 S.Ct. 1215, 1217, 89 L. Ed. 1700].

In Daniels v. United States, 407 F.2d 1345, 187 Ct.Cl. 38 (1969), after quoting the above language from United States v. Shimer, supra, the Court said:

It should be clear from the cited authorities that this court will not purport to tell the Secretary of the Navy what salary formula and base he should adopt. Our concern is simply to determine whether plaintiffs have met their heavy burden of proving that the Secretary's action in this instance was so arbitrary as to be clearly wrong. This they have failed to do.

In Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788, the shipping line sought to have the Court require the Canal Co. adjust its rates to conform to the language of the treaty that the "charges for traffic shall be just and equitable," and therefore to require the Company to "fix new tolls." The Court said that within the provisions of what was "just and equitable" Congress left to the Company the fixing of tolls. In denying relief, the Court said it "must infer that the decision to act or not to act is left to the expertise of the agency burdened with the responsibility for decision." [356 U.S. 318, 78 S.Ct. 758].

The Navy's present system of fixing pay of supervisors came into existence about 1952. It has been used for many years. To be sure Congress is aware of the use of such a system, since it approves the Navy's budget. While that "does not necessarily mean that the construction of the Statutes (Act) pressed on us and on Congress by defendant (petitioner) is the correct one," it does "indicate that the question is so wide open and at large as to be left at this stage to Navy's (agency) discretion." Panama Canal Co. v. Grace Line, Inc., supra.

How often surveys are to be conducted, the means of conducting them, the fixing of grades and classifications, and the fixing of a basis for supervisory pay is under the statute left to the discretion of the Navy, and now transferred to the Civil Service.

■ In order to prevail in this action, the plaintiffs have the "heavy burden of proving that the Navy's [Secretary's] action in this instance was so arbitrary as to be clearly wrong." Daniels v. United States, supra, 407 F.2d 1347.

■ Plaintiffs' complaint that the pay of supervisors is not in keeping with that of the Newport News Ship is not supported by the record. First, it has been next to impossible for the defendants to obtain information from Newport News Ship, and the record here is far from complete in that regard. Secondly, it is difficult to pair the supervisors of the two installations as to duties, number of persons supervised, responsibilities, etc. The evidence in the record concerning these matters, and comparable pay scales, is lacking. About the only comparison which can be made is the number of persons supervised. But the defendants are not limited to meeting the standard of Newport News Ship. They have the duty to establish rates "as nearly as is consistent with the public interest" to conform "with those of private establishments in the immediate vicinity," and under the law prior to September 1966, and since that date "consistent with the public in-

terest in accordance with prevailing rates." Hence, the pay rates must be (a) consistent with the public interest, and (b) conform with those of private establishments in the immediate vicinity, or, stated differently for use since September 1966, in accordance with prevailing rates. Just as one swallow does not make a summer, the rate of pay of one industry does not necessarily fix the rate of "private establishments in the immediate vicinity," or the "prevailing rates." The labor market in the vicinity must be considered. Neither the highest nor the lowest rate of pay is to be accepted, but the prevailing rates, and then consistent with the public interest. The determination of that rate is for the defendants. The statute does not specify the means to be used to determine the pay scale, how frequent adjustments in rates must be made, or how data is to be collected. These are matters left to the discretion of the defendants.

What the defendants have determined is that the rate of pay for a tradesman or mechanic may and will vary from trade to trade and area to area, but a given level of supervision over that mechanic is worth a proportion more, and that the proportion should be the same throughout the Country. Defendants have determined that sound and efficient administration demands the use of such a consistent system throughout the Country, and between many facilities within a given wage area. Plausible arguments may be made against such a system, but the law vests this discretion in the defendants. This same system was before the Court in Daniels v. United States, supra. There the pay of civilian pilots was fixed by applying a formula of 70 per cent to the base pay of a Class A Ship's Master in the Military Sea Transportation Service. The statute under construction was in language similar to the statutes here. There, the Court said the defendants were vested "with great discretion in setting wages.

It is his administrative responsibility to determine how closely the salaries of the specified personnel can parallel the maritime industry's rates and still be 'consistent with the public interest.'" Much of what was said in that opinion is peculiarly applicable here. It was said there:

A showing of a regional salary difference without more is insufficient to prove that the Secretary's choice and use of the nationally applied salary rate was arbitrary and inconsistent with his statutory duty.

To sum up, the evidence does not show defendants did not review and/or compile the wages of persons doing substantially the same work and with similar responsibilities of plaintiffs, or that the surveys were not taken in similar industries, or that the defendants set an arbitrary differential in determining the pay of plaintiffs over the tradesmen they supervise. Nor does the evidence show that supervisory personnel were not used in making the wage survey. However, it should be pointed out that the Act does not specify or require that supervisory personnel be used in making any surveys.

As to the claim for overtime pay, plaintiffs seem to have abandoned this claim. Evidence was not presented on this claim, nor have plaintiffs raised the issue in their briefs. Defendants say that before plaintiffs could recover for overtime, written authorization is required, and that plaintiffs in their answers to interrogatories have admitted no written authorization was given. They cite Post v. United States, 121 Ct. Cl. 94, 99 (1951); Bantom v. United States, 165 Ct.Cl. 312, 317–319 (1964), cert. denied 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 93. The Court need not pass on this issue.

The plaintiffs' action is accordingly ordered dismissed.

## APPENDIX "A"

### CLASSIFICATIONS OF SUPERVISORS OVER BLUE–COLLAR WORKERS AT NORFOLK NAVAL SHIPYARD

| TITLE | NUMBER SUPERVISED | GENERAL DUTIES | PERCENTAGE OF PAY DIFFERENTIAL |
|---|---|---|---|
| Leader | 5 to 10 journeymen | Works with his men | 12% |
| Foreman Leading-Man | 12 to 28 | Plan the mechanics' work schedule, instruct mechanics in their work, review quality of work, grant leave on ratings, etc. | 25% increased July 1969 to 30% |
| General Foreman I | 28 to 95 | Will have 2 to 5 Foremen-Leadingmen working with him, with their groups. | 40% increased to 45% |
| General Foreman II | 100 to 200 | Will have several General Foremen I (sometimes called Quartermen) working with him. | 55% increased to 60% |
| Superintendent I | excess of 200 | In charge of a small shop or may be assistant in charge of a large shop. | 175%* |
| Superintendent II | 400+ | Head of a shop | 215%* |
| Group Superintendent | Several Thousand | Supervises a group of shops, each of which is headed by a Superintendent I or II, is a coordinator over this group. | 227%* |
| | | | * Based on National Average. |

## APPENDIX "B"

### CLASSIFICATIONS OF SUPERVISORS OVER BLUE–COLLAR WORKERS AT NEWPORT NEWS SHIPBUILDING AND DRY DOCK CORPORATION

| TITLE | NUMBER SUPERVISED | GENERAL DUTIES | METHOD OF PAY |
|---|---|---|---|
| Quarterman | 10 to 25 | Directs activities of craftsmen. | Weekly salary |
| Assistant Foreman | 5 to 12 Quartermen (50 to 300 men) | | Monthly salary |
| Foreman | 500 to 2000 | A department head—in charge of entire operation. Considered one of the top management. | Monthly salary |
| Assistant Superintendent | | In charge of a department or several departments. | |
| Superintendent | In charge of 5 Assistant Superintendents | In charge of a division —several departments. | |