Per Curiam:
This case comes before the court having been submitted on plaintiff’s exceptions to the recommended decision, filed November 28, 1972, by Trial Judge Louis Spector pursuant to Rule 134(h). The court has considered the case on the briefs of the parties without oral argument of counsel. Since the court agrees with the recommended *309 decision of tlie trial judge, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore it is concluded that plaintiff is not entitled to recover and the petition is dismissed.
OPINION OP TRIAL JUDGE
Spectoe, Trial Judge:
Plaintiff, a former classified employee of the U.S. Bureau of Customs, is suing to recover compensation denied him due to defendant’s alleged failure to follow its own regulations pertaining to the establishment of salary rates for transferring federal employees, said regulations having been issued by the Civil Service Commission and the Bureau of Customs. As additional grounds, plaintiff claims that defendant’s action violated the congressional policy mandate expressed in the Classification Act of 1949, specifically that portion of the policy statement which seeks to insure “equal pay for substantially equal work.”[1]
Plaintiff has a five-point veterans preference, having served in the U.S. Armed Forces for about 7 years during World War II and the Korean conflict. Thereafter, he graduated from New York Law School in 1960 and was admitted to the New York Bar in 1961. In June 1961, he entered the U.S. Civil Service as a grade GS-7 Estate Tax Examiner with the Internal Bevenue Service at Bochester, New York. He remained with the IBS for approximately 2 years, reaching a grade level of GS-9, step 2, which paid an annual salary of $6,900.
Plaintiff was not entirely satisfied with his situation at the IBS, and in early 1963 successfully passed the Federal Service Entrance Examination, achieving a grade GS-7 rating for several positions. Among those positions for which plaintiff qualified was that of Customs Examiner, GS-1892-7. As a result of having had his name posted to a certificate of eligible candidates, he received an “Inquiry as to Availabil *310 •ity” dated May 14, 1963, from the Office of the Customs Appraiser in Buffalo, New York. In addition to indicating that plaintiff was being considered for the position of Customs Examiner, grade GS-7, it recited the entrance salary for that grade of $5,540 per annum. Plaintiff returned the inquiry, designating in the appropriate space that he was available and wished to be considered for the job.
Shortly thereafter plaintiff was interviewed by John E. Chilton, the Customs Appraiser and the appointing officer. Mr. Chilton outlined the duties and responsibilities of a customs examiner and plaintiff’s prospects for advancement within the appraiser’s office. Plaintiff knew that he was being considered for employment as a grade GS-7, but denies that the specific salary step within that grade which he would receive was discussed during the interview. Mr. Chilton, however, recalls that plaintiff was informed he was expected to enter at the first step of the grade.
Plaintiff did not inquire into the appraiser’s specific hiring policy relative to a transferring federal employee, nor did the appraiser volunteer to enunciate a policy. He testified that he did not tell plaintiff there was any possibility of getting a higher step within grade GS-7, because he was not asked. Plaintiff was the first transferring federal employee Mr. Chilton had hired. He had no published written policy on salary to be paid transferring federal employees. After appropriate preemployment and security checks, plaintiff transferred to the Bureau of Customs effective October 20, 1963.
On the day plaintiff reported for duty and was sworn in, he asked the personnel officer if he was obliged to suffer the monetary reduction from grade GS-9, step 2 ($6,900 per year) to grade GS-7, step 1 ($5,540 per year). He was told that nothing could be done, and that he had to accept the salary offered. The persomiel officer did not offer to explain why plaintiff was restricted to the first step of the grade, nor is there any evidence that plaintiff sought any further explanation. Plaintiff then took the oath of office and entered upon duty. He remained with the customs appraiser until October 1969 when he left to become an assistant attorney general for the State of New York, the position he held at *311 time of trial. A legal degree or license was not required for either of the positions plaintiff occupied while in the federal service, but it was useful. During his service with the Bureau of Customs, plaintiff was a valued employee who received recognition in the form of awards and commendation.
It is not in dispute that Mr. Chilton, as a “Principal Field Officer” within the Bureau of Customs, had discretion to establish plaintiff’s salary within the minimum and máxi-mums prescribed by law. Civil Service Commission Regulation 25.103 (b), then controlling, provided:
(5) Position or appointment changes. Subject to the mandatory requirements of paragraph (g) of this section and section 25.104, an employee who is reemployed, transferred, reassigned, promoted, repromoted or demoted, may he paid at any scheduled rate for his grade which does not exceed his highest previous rate. If the employee’s highest previous rate falls between two scheduled rates of his new grade, he may he given the higher rate. If the employee’s existing rate of basic compensation is less than the minimum scheduled rate of the new grade, his compensation shall be increased to the minimum rate.[2] [Emphasis supplied.]
At the time of plaintiff’s hiring, the Bureau of Customs Personnel Manual delegated the authority to fix such salary rates to “Principal Field Officers” in these terms:

General:

Each principal field officer is responsible for the administration of the pay program in his organization and for compliance with all provisions of the law, decisions based upon the law, and the regulations, policies and procedures prescribed by the Civil Service Commission, the Department of Treasury, and the headquarters office of the Bureau of Customs. * * *
# if: ‡ if: ❖

Limitation on Principal Field Officer Authority:

With the exception stated in the following paragraph, principal field officers shall establish salary rates in those cases in which administrative discretion is permitted. Rates so established shall conform to the policy expressed on page Pl-1 hereof. [3] [Emphasis supplied.]
*312 On page Pl-1, the following policy is enunciated:
In any case in which the exercise of administrative discretion is required, the Customs Service endeavors to establish a rate which will represent the best possible balance in fairness to ail employees directly or indirectly concerned, and still serve the best interest of the Oustoms Service.
While the factors considered in arriving at the rate required under this policy necessarily vary according to the circumstances surrounding the specific case, the result of the application of the policy is a pay administration which is consistently fair. [Emphasis supplied.]
Because of his prior service at grade GS-9, plaintiff could therefore have been transferred at a salary corresponding to a higher step within grade GS-7.
Plaintiff does not challenge the regulation delegating discretion to principal field officers to establish salary rates of transferring employees. The primary basis of his complaint centers around the alleged failure of the appraiser to formulate any policy; or the absence of fairness in any policy that is demonstrated by the evidence. More precisely, plaintiff cl aims in his brief that :
* * * [H]is hiring was done in such a manner that he was mislead [sic] as to the discretion of the Customs Appraiser and the policy under which the Customs Appraiser operated and that he was mislead [sic] to his detriment in violation of statutes and regulations.
Plaintiff further asserts that the appraiser violated “rules and regulations” when he did not establish a fair and consistent local hiring policy with respect to federal transferees.
As well as can be gleaned from the record, plaintiff makes two principal arguments resting on abuse of administrative discretion and lack of fairness, in violation of regulations.[4] They can be summarized as follows:
I. Defendant’s representative violated regulations by failing to implement agency policy with a specific, fair and consistent local hiring policy. To the extent that the principal field officer evidenced a local policy by actual practice, that policy was one of “bargaining and *313 bartering,” and was not countenanced by agency policy. Moreover, since plaintiff was not informed of tins policy and of tbe discretion tbe biring officer could exercise, he was not aware of bis bargaining position and therefore in no position to bargain. It is argued that this was in effect misrepresentation by silence when there existed a duty to speak, in addition to the affirmative misrepresentation by the personnel officer that “nothing can be done.”
II. The hiring officer was in violation of the Classification Act of 1949 which enunciates a “principle of equal pay for substantially equal work.”
These arguments are considered in turn.
I.
In a factual situation such as presented here, where relatively broad discretion has been vested by statute or regulation in an administrative official, inquiry is necessarily limited to the reasonableness of the official’s exercise of discretion in light of the prevailing circumstances. Reversal of that decision is ordinarily available only where the official exceeded his authority, or was clearly wrong. United States v. Shimer, 367 U.S. 374, 382 (1961); Albert v. United States, 194 Ct. Cl. 95, 102, 437 F. 2d 976, 979 (1971); Port Authority of St. Paul v. United States, 193 Ct. Cl. 108, 115, 432 F. 2d 455, 459 (1970); Daniels v. United States, 187 Ct. Cl. 38, 42, 407 F. 2d 1345, 1347 (1969).
The first issue to be considered is the appraisei*’s alleged failure to properly value the status of a federal transferee in establishing a local hiring policy. In that connection, it is necessary to review the development and implementation of his hiring policies. Plaintiff has questioned the existence of any policy whatever at the time of his hiring. Mr. Chilton testified, however, that upon his appointment as customs appraiser and at all relevant times thereafter, he applied a definite policy for the hiring of new employees. When Mr. Chilton entered upon duty as customs appraiser in August 1962, he adopted the long-established policy of the Buffalo collector of customs. At that time the collector’s policy was to set. the salaries of all incoming employees, regardless of transferee status or prior federal service, at the first step of their entering grade.
*314 Tbe collector’s and appraiser’s offices were located in the same building in Buffalo and were serviced by the same personnel officer. They did, however, represent separate lines of authority, and the collector exercised no supervisory or administrative control over the appraiser. Due to the close physical proximity and the sometimes close working relationship of the two offices, the appraiser felt that it would be in the best interests of the Customs Service to follow the practice of the collector in order to maintain a uniform hiring policy for customs employees in the Buffalo area. His decision to adopt the policy of the collector was communicated to the personnel officer shortly after his appointment.
It cannot be said that the appraiser’s decision to follow the policy of the collector at this time was improper or arbitrary. The collector was experienced in hiring in the Buffalo area, and presumably was informed as to market conditions as well as other employment factors upon which such a hiring policy is necessarily based. The Customs Bureau Personnel Manual does not suggest that the principal field officer must arrive at his hiring policy independently of the judgment or advice of similarly situated bureau officials. On the contrary, the sensible exercise of personnel administration would seem to favor such an exchange, and search for consistency. Furthermore, Mr. Chilton testified that it was his understanding that the general practice throughout the other districts of the 'Customs Bureau was for the collector and appraiser (where centrally located) to maintain a uniform local policy, and for the appraiser to follow the collector’s policy (because of the comparatively smaller size of his staff).
Plaintiff correctly assumes that the policy .in effect at the time he was hired ignored his special status as a transferring federal employee. Under that policy, all new employees entering the Bureau of Customs were treated equally. It does not follow, however, that the policy was unfair to plaintiff, nor that Bureau of Customs or any other regulations required that transferee status be taken into account. Any decision to transfer to another agency at a lower grade is within the control of the employee. If he knows he must accept a *315 reduction in salary, that is one of the factors he must weigh in making his decision.
'For the narrow purpose of reviewing the exercise of this policy-fixing discretion, it must he presumed that prospective transferee employees are aware of the pay which they are to receive.[5] With this presumption, when a federal employee transfers for his own convenience to a lower grade and salary, absent fraud, duress, or some other compelling circumstance, he must assume the responsibility for his decision. There is no inherent unfairness in asking him to make this choice.
At trial plaintiff agreed by stipulation to a proffer of testimony by Bureau of Customs personnel officials, had they been presented in court. This proffer concerned the hiring policy of the Customs Bureau during the period in question. The stipulation indicates that at the time plaintiff was hired, principal field officers in the bureau had discretion to establish a policy providing for payment to transferring federal employees at the lowest step within their entering grade if they so desired.
On May 17, 1966, Lester D. Johnson, the Commissioner of Customs, replied to plaintiff’s request for a salary adjustment, stating in part:
Principal field officers in the Customs Service determine the policy of their offices with respect to use of the highest previous rate. During the period 1954 through the period of your appointment (October 1963), the appraiser of merchandise in Buffalo did not use the highest previous rate provision in appointments from outside the Customs Service and all such appointments were made at the entrance rate of the grade. Accordingly, there is no justification for granting a pay adjustment in your case.
Plaintiff received a similar reply from the Assistant Secretary of the Treasury on November 16,1966. Neither of these replies was preceded by a ¡hearing or the presentation of evidence.
From the foregoing, it is evident that the Customs Bureau did not in general expressly require that any special con *316 sideration be given to employees transferring within the federal service.[6] Furthermore, John E. Sauerhoff, an employee of the U.S. Civil Service Commission, and the defendant’s expert witness at trial, testified that plaintiff’s appointment at the first step of the grade was not unusual, nor in violation of Civil Service Commission regulations.
Plaintiff has implied this requirement from the relatively broad policy earlier quoted from the customs personnel manual, but has not produced any evidence other than that relatively broad policy statement to support his contention that he was singled out for unusual treatment. Without more, it cannot be said that the appraiser’s policy was outside the permissible limits imposed by agency, departmental, or commission regulations. Under the circumstances, it was not unreasonable for the appraiser to adopt the existing local hiring policy of the collector; nor was the fixing of that policy without special consideration for transferring employees an abuse of discretion.
The thrust of a plaintiff’s argument is, however, that if there was a policy it was elastic, and improperly applied. This argument originates in the fact that he was apparently the first and last person to whom that policy was applied by Mr. Chilton. The record reveals that approximately 1 year after plaintiff was hired, the appraiser was again faced with a similar situation. Mark E. Mahoney, a Claims 'Representative, grade GS-9, step 3 ($7,710) with the Social Security Administration, applied to the Buffalo office for a grade GS-7 Customs Examiner position. He was about 25 years of age at the time and his experience prior to Social Security had been in a labor and construction crew. Mr. Mahoney wished to preserve his salary rate to the extent possible and, unlike plaintiff, made that wish known at the time of his interview with Mr. Chilton.
Consistent with the then existing policy, the appraiser told Mr. Mahoney that he would have to accept the first step of grade GS-7 if he desired to transfer to Customs. Mr. Mahoney declined the reduction in salary, and the inter *317 view was terminated. Mr. Mahoney testified that “[t]he interview more or less ended there, so to speak, because they were not sure that they could give me any more than that.” [7]
His refusal to accept a reduction in salary apparently prompted Mr. Chilton to reconsider his policy in light of existing personnel needs. He testified that at the time of the Mahoney interview, the appraiser’s office was in need of help. His workload regularly increased 'by approximately 35 percent every year, and because of a personnel squeeze, he had been forced to close a field office located in Niagara Falls, New York. He had been able to fill only one position at that time, whereas he had filled four vacancies at the time plaintiff was hired.
This workload and personnel situation, coupled with Mr. Chilton’s realization that he had to be more competitive if he were to secure well-qualified employees from the other Federal agencies, resulted in a retreat from his rigid entrance salary policy for transferring employees. A new collector of customs had meanwhile been appointed and the appraiser discussed the proposed change with him and the personnel officer. The hiring policy for transferring federal employees was then liberalized and Mr. Mahoney was offered the customs examiner position at a grade GS-7, step 9, a reduction in annual salary of only $60. Mr. Chilton testified he would have hired Mr. Mahoney at the first step of grade GS-7 had he not resisted, and that he “may have been influenced by the resistance” in changing his policy. Mr. Chilton also testified that had Mr. Odian protested, he “would have considered” his request. Mr. Chilton was asked:
Q. Well, isn’t there the element of bargaining and negotiations here, Mr. Chilton, in the operation of your office ? Aren’t you really saying that I have the discretion under the regulations and the law and I am the appointing officer? I have the discretion to appoint within this grade at any step not exceeding his prior rate, but if I can get him cheaper, I will get him cheaper.
A. No, sir. That would be contrary to the law. The law says, “Whatever policy I have must be consistent *318 for all.” You are saying that I can bargain with people that come in the door and pay them anything that I can and get away with it. That is not so. I can’t bargain with anybody.
The law says that I must set a policy that must be consistent. It is dictated by the needs of the service, only the needs of the service and not the influence or the ability to bargain with the individual. No individual can bargain with me but a pay rater. The answer is, no.
The new policy was applied on a second occasion approximately 1 year after Mr. Mahoney’s transfer, when John J. Anthony applied to become a customs examiner with the appraiser. Mr. Anthony had theretofore been serving as a Buildings Manager, grade GS-9, step 1, with the General Services Administration. However, it was concluded that this experience, coupled with his education, qualified him for a position only at the grade GS-5 level. He was hired at that grade and given the salary rate of step 10 within grade GS-5. Although this resulted in a substantial cut in salary from his former position, it was the maximum amount Mr. Anthony could have received under the law as a grade GS-5.
In summary, the facts establish that plaintiff on the occasion of his transfer was given the lowest allowable rate under the law, in accordance with the then existing policy of the Buffalo customs appraiser. Approximately 1 year later, when the same type of situation was presented, that policy was changed so as to afford subsequent transferring federal employees the opportunity to enter at salary rates which preserved, to the extent possible, their prior rates of pay.
Although the change in policy benefited subsequent employees, it is not plaintiff’s contention that the change in policy was unfair to him. It is his position that the alleged failure to disclose the local policy was unfair because it prevented him from attempting to modify it in his case at that time, and resulted in his working side by side with people earning more than he. He contends that the omission constituted a violation of the aforementioned Bureau of Customs policy.
Plaintiff suggests two occasions during the process of his employment where this information should have been revealed. He claims that the appraiser should have explained *319 his policy, and broader authority, at the time of their interview so that he could have put forward his case for a higher step in grade; and that the personnel officer should have advised him of the policy and permissible discretion at the time he asked, just prior to administration of the oath of office.
After careful consideration of the evidence, and with due regard for the necessity of fairness and even-handed treatment in personnel administration, it must be concluded that the customs appraiser’s failure to reveal his local policy, or the limits of his discretion, was neither a violation of Customs Bureau regulations nor an abuse of administrative discretion.
A distinction must be drawn between the form and the substance of the information that plaintiff contends should have been made available to him. In substance plaintiff is maintaining that the appointing officer must state the salary rate which the prospective employee will be paid, and why he is to receive that rate and not some other. The form in which plaintiff desires this information to be communicated, is as an official statement of hiring policy at the employment interview. There can be little doubt that the information sought here is often revealed in another form, namely, the informal exchange that takes place during the interview between applicant and employer. The Mahoney interview is a case in point. The fact that the employer does not phrase his salary offer in terms of his “policy,” would seen to be immaterial. What the prospective employee fairly and reasonably needs to know is how much he is going to be paid, and whether or not he can reasonably bargain for more. The answers to these questions may properly be brought out in a bilateral salary discussion, without the need of affirmatively representing them as “policy.” In other words, concepts of fairness do not require that the hiring officer must phrase his position in terms of a discretionary policy.
Furthermore, there is nothing in the overall Customs Bureau policy statement earlier quoted, which would mandate the disclosures sought by plaintiff. That policy is phrased in broad and general terms and indicates the desired end to be achieved. If the Customs Bureau intended to impose upon *320 ■its principal field officers the specific requirements here urged by plaintiff, it could have done so in terms more specific.
The foregoing analysis assumes that a discussion of salary will normally arise in the course of an employment interview. Plaintiff has testified that no such discussion of salary took place during his interview with Mr. Chilton. It is Mr. Chilton’s recollection that plaintiff was offered the first step of grade GS-Y. This is a most troubling aspect of the case, for it is difficult to imagine a situation where there would be no discussion of that important aspect of the employment relationship. However even assuming, arguendo, that there was no such discussion, it does not follow that the appraiser’s silence on that subject was arbitrary, unfair or unreasonable.
Viewed from the standpoint of the hiring official, the man seated before him had indicated that he wished to be considered for a position for which an annual salary of $5,540 had been recited. The appraiser had every reason to believe, particularly in view of plaintiff’s apparent silence on salary matters, that plaintiff was willing to accept the position as initially described. There was no cogent reason for him to volunteer the information that under the bureau’s regulations he could offer employment at a step equivalent to the applicant’s current salary, but that his policy was to begin all new employees (including transferees from outside the bureau) at the first step. There was nothing that would have put the customs appraiser on notice that plaintiff did not understand that the position offered was at step 1, or that plaintiff was reluctant to accept the salary expressed in the inquiry as to availability.
Any preemployment interview is a two-way street looking to an exchange of information and ideas between applicant and employer. Plaintiff acknowledged that he was aware at the interview that Mr. Chilton was the man who made the hiring decisions. If he was concerned with his salary rate and the appraiser failed to bring it up, plaintiff should have made these reservations known at that time, and the information that he alleges was illegally denied him would in all probability have been revealed and discussed. If the appraiser was in fact silent, it was apparently because he believed plaintiff was willing to transfer at the first step of the grade. As a consequence, he cannot be charged with *321 having misrepresented Ms Mring policy or the salary of the position, by silence or by anything expressed.
As practiced by Mr. Chilton, his policy does appear to come dangerously close to one of “bargaining or bartering,” which he acknowledged would be illegal. The explanation for this, however, is that plaintiff’s hire was the only instance in wMch he had opportunity to apply his policy until he met with resistance and changed that policy.
The final argument to be considered revolves around the statements attributed to the personnel officer at the time plaintiff took the oath of office. It has earlier been noted that when plaintiff asked if he was required to accept the reduction in salary he was told that “notMng could be done.”[8] Plaintiff claims that this statement conveyed the impression that nothing could legally be done; that this was a misrepresentation of the appraiser’s discretionary policy (and authority) and resulted in plaintiff’s being misled to his detriment.
The personnel officer’s function, however, was a ministerial one. It was his responsibility to carry out the policies of the collector and appraiser. He had no authority to vary salary rates, nor could he modify the policies established. When he replied to the effect that “nothing could be done” to change plaintiff’s salary, that was consistent with the then policy of the appraiser, namely, that new hires (including federal transferees) would be at the first step of the entering grade. While it is true that the personnel officer did not specifically advise plaintiff that the appraiser had certain discretion in fixing salary rates, his answer was responsive to the question raised.
Finally, plaintiff has not established that, even had he discussed entrance salary policy with the appraiser, the policy would have been modified at that time, as it was in the case of transferee Mahoney a year later. As a result of his protest, Mr. Mahoney was admittedly able to secure a change in policy, but under circumstances more pressing in the opinion of the hiring official. Furthermore, a new collector of *322 customs had meanwhile been appointed, and he was more amenable to a change in Buffalo area policy. The appraiser testified that had Mr. Mahoney applied at the time plaintiff was hired and had he then requested a higher salary, he would probably have been turned down. Plaintiff has been unsuccessful in demonstrating that he would have been accorded the same treatment as Mr. Mahoney had he been privy to hiring policy, and similar treatment cannot be presumed from the evidence presented.
II.
Section 101 of the Classification Act of 1949, ch. 782, 63 Stat. 954,[9] provides in part:
It is the purpose of this chapter to provide a plan for classification of positions and for rates of basic compensation whereby—
(1) In determining the rate of basic compensation which an officer or employee shall receive, (A) the principle of equal pay for substantially equal work shall be followed * * *.
Plaintiff claims that the congressional policy of equal pay for equal work was violated when he was appointed to his customs esaminer position at the first step of grade GS-7, while Mr. Mahoney was subsequently appointed 'at the ninth step of that grade. Plaintiff presumes 'Congress intended that employees doing identical work be appointed at identical compensation. It is clear from the language of the section, however, that Congress intended only that employees doing the same level of work be paid the same basic rate of compensation. To achieve this end, Congress appears to have established an organized system for classifying positions by grade, based upon the nature of the work, the qualifications required, and the varying levels of difficulty and responsibility. In Title VI of the Act, Congress established “Basic Compensation Schedules” including the General Schedule (GS) which was divided into grades one through 18. Each grade represents a different level of difficulty and responsibility. The “rate of basic compensation” in section 101 *323 clearly refers to tlie grade level within the basic compensation schedule. Employees working at the same levels of difficulty and responsibility (but in different jobs) are to be assigned the same grade and therefore to be paid in accordance with the same basic rate of compensation.
Plaintiff has confused the term “rate of basic compensation” with the schedule of per annum rates established in section 603 (a) of the Act. That schedule of per annum rates reflects a range of salary levels, or steps, within each grade.[10] The means of achieving step increases are provided for in Title VII of the Act. There can be little doubt that Congress sought to achieve parity at the grade level, not the step level. Plaintiff does not dispute the grade level at which his position was classified, and therefore his reliance on section 101 is misplaced.
Within a framework provided by the Act, the Civil Service Commission has been delegated responsibility for establishing the general rules of compensation.[11] In discharging that responsibility, the commission has authorized the various federal agencies to exercise discretion in certain situations and, as in this case, some of those agencies have further delegated that discretion to appointing officials. The exercise of that discretion has been discussed under I, above.
All of the foregoing considered, it follows that plaintiff is not entitled to recover, and the petition should accordingly be dismissed.
CONGLTXSION OE LAW
Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

 Whereas the court adopts the trial judge’s separate findings of fact, which are set forth in his report filed November 28, 1972, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

 Act of October 28,1949, ch. 782, § 101, 63 Stat. 954.

 Customs Personnel Manual, Transmittal Sheet No. 56, pp. Pl-2 to Pl-3, November 19,1956.

 5 C.P.R. § 25.103(b) (1961).

 Plaintiff las not suggested, nor does the record reflect, personal animus on the part of the appraiser or an effort to favor other employees. Cf. Eclov v. United States, 137 Ct. Cl. 341 (1957).

 As later discussed, plaintiff’s prior knowledge of the proposed salary reduction, and of his right to bargain, are Important Issues in this particular case.

 The bureau’s regulations, as set forth on p. Pl-3 of the customs personnel manual, did specifically require that the existing rate of salary be maintained for bureau employees transferring between principal field offices. However, no such requirement was imposed upon transfers from other agencies.

 He also testifies: “Well, they seemed to intimate that they couldn’t make a decision that day, that they may have to go higher to get permission. This is the inference that I drew, but as to anyone saying that, I can’t say that anyone did say.”

 Plaintiff variously quotes the personnel officer as having stated: “There is nothing that we can do about it. That Is it. I’m sorry.”; “Nothing can be done.”; “* * * [T]here is nothing that you can do about it.”; and “There is nothing that I can do.”

 Section 101, as amended, may now be found at 5 U.S.C. § 5101 (1970).

 The original schedule of per annum rates established In 1949 provided for a minimum of only one step at grade GS-18 to a maximum of seven steps at grades GS-1 through GS-11. under that schedule, employees earning salaries at the highest step in grades GS-1 through GS-10 would have been receiving more than employees earning salaries at the first step of the next highest grade. Congress could not have intended the “equal pay for equal work” provision to apply at the salary step level (within grade) since to do so would have been inconsistent with the per annum rate structure established by the same Act.

 Classification Act of 1949, ch. 782, § § 801-03, 63 Stat. 969.