**Antonio BENEVENTO et al.**

**v.**

**The UNITED STATES.**

**Anthony F. VEARA**

**v.**

**The UNITED STATES.**

**Richard E. ADAMS et al.**

**v.**

**The UNITED STATES.**
**Nos. 170–66, 298–66 and 28–67.**

United States Court of Claims.
June 16, 1972.

Joel C. Glanstein, New York City, for plaintiffs. David Scribner, New York City, attorney of record. Steven Thaler, New York City, of counsel.

Michael B. Rosenberg, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## OPINION

### PER CURIAM:

These cases were referred to Trial Commissioner Harry E. Wood with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on October 29, 1970. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by plaintiffs, defendant moved that the court adopt the commissioner's report and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases. Therefore, plaintiffs are not entitled to recover and their petitions are dismissed.

1. These cases have been consolidated with Walter E. Beatteay, et al. v. United States, No. 337-66; Gerald Benham, et al. v. United States, No. 78-67; and Meredith Clapp, et al. v. United States, No. 226-68, but are separately reported to the court. Finding 1, note 1.

* The commissioner's reports in cases No. 337-66, 78-67 and 226-68 have been adopted by *orders* of the court dated and announced the same date as that of this opinion [footnote by the court].

2. The petitions herein were filed May 26, 1966; August 12, 1966; and January 27, 1967, respectively. The claims sued on extend only to December 16, 1965. See 28 U.S.C. § 2501 (1964); Findings 3, 24; Daniels v. United States, 407 F.2d 1345, 1346, 187 Ct.Cl. 38, 40 (1969).

## OPINION OF COMMISSIONER

### WOOD, Commissioner:

Plaintiffs in these cases [1*] were, throughout all or part of the period here material,[2] ungraded vessel employees of the Bureau of Commercial Fisheries, Department of the Interior, employed as engineers aboard the *Delaware* or *Albatross IV*,[3] with home ports of Gloucester and Woods Hole, Massachusetts, respectively.

Both vessels were employed in aid of the commercial fishing industry, primarily in New England waters, during the relevant period. The *Delaware*, a converted fishing vessel built in 1938, was an exploratory fishing and gear research vessel employed, *inter alia*, in testing experimental fishing gear and in fishing for research purposes; fishing was the main activity aboard the vessel during a cruise. The *Albatross IV*, built in 1962, was specially designed to, and did, conduct fisheries and oceanographic research. See findings 7, 8.

Section 202(8) of the Classification Act of 1949, 63 Stat. 954, 955, as amended, 5 U.S.C. § 1082(8) (1964),[4] provided in pertinent part that:

This Act [Classification Act of 1949] * * * shall not apply to—

* * * * * *

(8) officers and members of crews of vessels, whose compensation shall be

3. With the approval of the late Commissioner Richard Arens, who presided at trial and closed proof, it was agreed (1) that the court's determination on defendant's liability to plaintiffs whose claims are based on employment on the two named vessels "shall be applicable to and binding on plaintiffs in the aforesaid cases" whose claims are based on employment on other Bureau of Commercial Fisheries vessels, and (2) that trial would be limited to the issues of law and fact relating to the right to recover, reserving determination of the amount of recovery, if any, for further proceedings.

4. Recodified as 5 U.S.C. § 5342(a) (Supp. V, 1965–69).

fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry.

That plaintiffs were within the purview of Section 202(8) is admitted; at issue is defendant's treatment of them under the statute.

## I

Throughout the period here relevant, authority to approve wage rates for plaintiffs was vested in the Regional Director, Region 3, Bureau of Commercial Fisheries; the determination of such wage rates in the first instance (subject to approval) was made by the "Region 3 Wage Board", composed of a chairman, two members, and two alternate members.

In findings 16–23, Wage Board practices and procedures in setting wage rates for plaintiffs prior to and throughout the period here material are detailed at some length. With some variants in formula from year to year, plaintiffs' compensation for hours worked at sea was essentially derived from the average hourly earnings of commercial fishermen in the large (17-man) otter trawler fleet operating out of Boston, Massachusetts, applied to the number of days estimated to be worked at sea by plaintiffs, utilizing a 12-hour workday for each such day. Other factors, noted in the findings, were utilized to adjust the "basic fisherman's sea pay" in order to arrive at annual compensation for plaintiffs' work at sea.[5]

At least during the 1960–1965 period, there was no such thing as overtime in the commercial fishing industry. Engineers employed aboard a large Boston otter trawler were compensated on the basis of a "share" of a percentage of the proceeds of the catch[6] plus a "bonus"

for each fishing trip, and were paid no "overtime" compensation for any hours worked at sea. Finding 25(e).

Since, insofar as hours at sea are concerned, wage rate schedules for plaintiffs were derived from earnings of Boston otter trawler crew members, these wage rate schedules in turn reflected no element of overtime compensation for work at sea in excess of 8 hours per weekday or 40 hours a week, nor for hours worked on Saturdays, Sundays, or holidays. Plaintiffs' "normal" workday at sea was not less than 8 nor more than 12 hours, and they in fact worked at sea up to 12 hours per day prior to December 17, 1965.

Generally speaking, during part or all of the period here material, engineers serving at sea aboard commercial dry cargo and tanker vessels, at least some oceanographic research vessels operated by private industry, and vessels operated by the Military Sea Transportation Service (MSTS), Department of the Navy, were paid premium or overtime compensation for work in excess of 8 hours per weekday or 40 hours per week, or for work on Saturdays, Sundays, or holidays.

In the circumstances noted hereinabove, plaintiffs were not. The essence of their complaint is that in utilizing the commercial fishing industry, and in failing to select "the commercial offshore, dry cargo and tanker industry,"[7] as "the maritime industry" for Section 202(8) purposes, defendant acted unlawfully, arbitrarily, capriciously, and unreasonably. Accordingly, they assert, they are entitled to recover overtime compensation for all hours of work performed at sea in excess of 8 hours per weekday or 40 hours per week, and for all hours worked on Saturdays, Sundays, or holidays.

---

5. Plaintiffs' claim relates only to hours worked at sea; there is no claim concerning any work in port.

6. *Compare* Cape Shore Fish Co. v. United States, 330 F.2d 961, 963–964, 165 Ct.

Cl. 630, 634 (1964); United States v. W. M. Webb, Inc., 397 U.S. 179, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970).

7. Plaintiffs' Main Brief, p. 30.

For reasons hereinafter set forth, it is concluded that plaintiffs are not entitled to recover.

## II

One of plaintiffs' contentions is that defendant "violated [Section] 202(8) * * * in setting the marine engineer plaintiffs' wages in accordance with a hybrid standard pay formula based on the earnings on the 17-man fishing trawler industry sailing out of Boston, Massachusetts harbor."[8] Plaintiffs assert that, under Ayres v. United States, 186 Ct.Cl. 350 (1968), a "showing of prevailing maritime industry practices in situations comparable to their own" will entitle them to prevail. And, they urge, a comparison of the elements of plaintiffs' employment with (a) the commercial fishing industry, and (b) the "commercial dry cargo and tanker industry as well as the private oceanographic research industry and with other [vessel-operating government] agencies", proves clearly a violation of Section 202(8).

In Daniels v. United States, 407 F.2d 1345, 187 Ct.Cl. 38 (1969), involving a similar claim, the court reaffirmed that Section 202(8) embodies a broad congressional grant of administrative discretion, with a concomitant limited scope of judicial review. "Our concern", the court held, "is simply to determine whether plaintiffs have met their heavy burden of proving that the Secretary's action in this instance was so arbitrary as to be clearly wrong." Ibid, 407 F.2d at 1347, 187 Ct.Cl. at 42. It is unnecessary to consider whether or not, in light of Daniels, plaintiffs read Ayers rightly. That they have failed to make the evidentiary showing they avow is dispositive.

Plaintiffs allege great differences between engineers aboard the Albatross IV and the Delaware and engineers aboard a Boston otter trawler; conversely, they would substantially equate engineers aboard the vessels in suit with those in the commercial dry cargo and tanker industry (and, to a lesser degree, the private oceanographic research industry and other vessel-operating government agencies). The "numerous comparisons" proffered include duties, equipment responsibilities, nature of missions, education and training experience, "wages, hours and compensation" and "prevailing rates and practices regarding payment of overtime or premium pay".[9]

To the extent permitted by the record, each of these factors is treated in the findings; what there appears will not be repeated here. For present purposes, it suffices to hold there is an absence of proof that in terms of duties, responsibilities, working conditions, character of work, or otherwise, plaintiffs were in any significant manner "comparable" to engineers aboard commercial dry cargo or tanker vessels, oceanographic research vessels operated by private industry, or vessels operated by other government agencies. Ayres v. United States, supra.

Research vessels operated in aid of the commercial fishing industry are obviously not commercial fishing vessels.[10] Manifestly, there were some differences, in terms of duties, responsibilities, working conditions, character of work, and the like, between engineers aboard the Albatross IV at sea and engineers aboard large Boston otter trawlers.[11] On this record, however, it cannot be concluded that in determining that plaintiffs' wages should be fixed in accordance with prevailing rates and practices in the commercial fishing industry, the Secretary violated Section 202(8). Daniels v. United States, supra; Ayres v. United States, supra; Abbott v. United States, 151 F.Supp. 929, 932, 138 Ct.Cl. 459, 463 (1957).

8. Plaintiffs' Main Brief, pp. 12–13.

9. Plaintiffs' Main Brief, pp. 5–6.

10. See, e. g., findings 7, 8, 13, 15(b), 25.

11. A lesser showing has been made as to engineers aboard the Delaware at sea.

In so holding, due consideration has been given to two subsidiary contentions: an asserted admission by defendant that the practices employed throughout the period here material were unlawful,[12] and that "the maritime industry", for Section 202(8) purposes, is the "commercial off-shore, dry cargo and tanker industry * * *."

Following December 17, 1965, plaintiffs have been compensated on the basis of wage rates negotiated with their "exclusive representative" under Executive Order No. 10988, Employee-Management Cooperation in the Federal Service, January 17, 1962, 27 Fed.Reg. 551.[13] In the first such agreement, in 1965, the practice of no overtime for work at sea, regardless of hours actually worked, was in essence continued. Finding 24(c). There was no waiver of any legal rights or actions, all such rights and actions being specifically reserved.

▪ Plaintiffs' admission argument flows, not from the 1965 agreement, but from one by which plaintiffs assert defendant "agreed [in 1968] that the prevailing rates and practices of the maritime industry *did not* include the fishing industry * * *, but were to be based on the prevailing rates and practices in the commercial dry cargo and tanker industry * * *."[14] The absence of proof that there was an adoption of prevailing rates and practices of the dry cargo and tanker industry aside, the 1968 agreement would no more amount to an "admission" by defendant of the illegality of pre-1965 practices than the 1965 one would amount to recognition by plaintiffs of their legality. Plaintiffs' reliance on a post-1965 admission is misplaced.

Plaintiffs' contention respecting the meaning of "the maritime industry" has as its foundation language in House Report No. 2200, 89th Congress, 2d Session,[15] to accompany the bill which ultimately became Public Law No. 89–747, 80 Stat. 1179, 5 U.S.C. § 6305 (Supp. V, 1965–69).

Public Law No. 89–747 accords government officers or crew members aboard any "oceangoing vessel on an extended voyage", including plaintiffs, leave of absence without regard to other leave authorized by "this subchapter." Findings 37(a), (b). That an allusion, in House Report No. 2200, to "the maritime industry" means the "commercial off-shore, dry cargo and tanker industry", as plaintiffs assert, is far from clear. In any event, however, plaintiffs' assumption that "the maritime industry", for Section 202(8) purposes, could have only that same meaning is not a tenable one.

Section 202(8) and Public Law No. 89–747 were enacted at different times, and deal with different matters: the one compensation for officers and members of crews of vessels, to be fixed "as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry," and the other leave benefits for officers and crew members aboard oceangoing vessels on an extended voyage. Nothing in the cited legislative history of Public Law No. 89–747 justifies adding to Section 202(8) words not included therein by Congress when it wrote the law in 1949, or thereafter. United States v. An Article of Drug Bacto-Unidisk, 394 U.S. 784, 800–801, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969); 62 Cases of Jam v. United States, 340 U.S. 593, 600–601, 71 S.Ct. 515, 95 L.Ed. 566 (1951). And, plaintiffs proffer no leg-

---

12. This contention, advanced at pp. 27–29 of Plaintiffs' Main Brief to support the argument that defendant "violated" Section 202(8), also appears as a separate line of argument at pp. 43–48 of Plaintiffs' Main Brief.

13. Revoked by Executive Order No. 11491, Labor-Management Relations in the Fed-

eral Service, October 29, 1969, 34 Fed. Reg. 17605.

14. Plaintiffs' Main Brief, pp. 46–47 (emphasis in original).

15. See finding 37(c).

islative history of Section 202(8) itself to buttress their views.

■ It is to be remembered, in assaying this aspect of the matter, that the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one. Waterman Steamship Corp. v. United States, 381 U.S. 252, 269, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965); United States v. Wise, 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); *compare* Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). Nothing in the record or plaintiffs' briefs supports the view that, in utilizing the commercial fishing industry for Section 202(8) purposes defendant thereby exceeded the scope of the statute.

### III

Plaintiffs also contend vigorously that "the Wage Board set their wages in an arbitrary, capricious and unreasonable manner in violation of [Section] 202(8) * * *."[16] This contention has two main facets: the essence of the first is that because of inadequate knowledge and experience, the chairman of the Wage Board throughout the period here material was unable to, and did not, "compare" plaintiffs with reasonably comparable services in the maritime field; of the second, that the Wage Board itself "made no attempt to compare."[17]

It is perhaps a complete answer that the record does not justify plaintiffs' view of comparable services. Section II, *supra.* There is a failure of proof that any reasonably comparable services in the maritime industry were not considered by the Wage Board. Thus, the argument that plaintiffs' pay was fixed

and adjusted without examination of the "functions, duties, and pay structures of *all pertinent classes* * * * in Government service and outside it"[18] would seem to be blunted. There are, however, other flaws in plaintiffs' position in any event.

■ Because Section 202(8) contains a broad congressional grant of administrative discretion, it imposes heavy administrative duties and responsibilities. In committing to the Secretary the task of wage-fixing for vessel employees Congress conferred upon him "the duty of setting a fair and competitive wage." See Abbott v. United States, *supra,* 151 F.Supp. at 932, 138 Ct.Cl. at 463. Discharge of that duty, by a determination of compensation "as nearly as is consistent with the public interest in accordance with prevailing rates and practices in the maritime industry," presupposes appropriate knowledge and consideration. See Daniels v. United States, *supra,* 407 F.2d at 1347–1349, 187 Ct.Cl. at 42–44, Abbott v. United States, *supra.*

Within what is now the Bureau of Commercial Fisheries, there is a history of the utilization of wage rate data from the commercial fishing industry for Section 202(8) purposes nearly as old as Section 202(8) itself. Within Region 3, the practice was in existence prior to 1958. In 1958, with the advent of a new Wage Board chairman, a thorough re-evaluation of prior Wage Board practices toward vessel employees was undertaken. Consideration was given to setting wage rates for vessel employees aboard the *Delaware* based on earnings of oceanographic research vessel employees of the Woods Hole Oceanographic Institution, but it was subsequently concluded that the prior procedure should continue to be followed.[19]

---

16. Plaintiffs' Main Brief, p. 34.

17. Plaintiffs' Main Brief, p. 41.

18. Daniels v. United States, *supra,* 407 F.2d at 1347, 187 Ct.Cl. at 42 (emphasis supplied); Plaintiffs' Main Brief, p. 39.

19. Representatives (the word is not used in any technical, labor-law, sense) of the

crew of the *Delaware* did not desire to have "their wages compared with those vessels." Finding 16(b). Interestingly enough, plaintiffs apparently still do not, for the record is essentially barren of reference to Woods Hole Oceanographic Institution vessels.

In 1959, the Regional Director, Region 3, appointed to the Wage Board a new chairman. The two members and the two alternate members who had been a part of the prior Wage Board continued to serve on the Wage Board. One of the two members, and one of the two alternate members, remained on the Wage Board throughout the period here material, as did the chairman appointed in 1959.

The approval of the Regional Director, Region 3, of any wage rate schedule determinations of the Wage Board was a prerequisite to effectuation of wage rate schedules affecting plaintiffs throughout the period here material. Plaintiffs have neither offered evidence nor requested any findings of fact concerning the Regional Director's knowledge, experience, bases for decision, or actions. The evidence relevant to the actions and knowledge of the Wage Board and the Wage Board chairman appointed in 1959 is summarized in findings 16–23.

At the outset of his tenure in 1959, the chairman of the Wage Board was clearly not as knowledgeable as he might have been; even to time of trial in 1968, he had never been aboard either the *Delaware* or the *Albatross IV* during a scientific operation, nor had he even been aboard a commercial fishing vessel. He relied, at least to some extent, on verbal advice from other Wage Board members, first in looking to the commercial fishing industry for wage rate schedule purposes, and later in an understanding of plaintiffs' duties and responsibilities as compared to those of personnel aboard commercial fishing vessels.

The record also shows, however, that all Wage Board members were of the opinion that plaintiffs were engaged in "fishing operations"; that the Wage Board considered all the duties and responsibilities of vessel employees aboard the *Albatross IV* and the *Delaware* and compared them with duties and responsibilities of employees in the commercial fishing industry; that, in 1959 and thereafter throughout the period here material, the Wage Board included at least one member and one alternate member who had participated in the 1958 reevaluation of Wage Board practices; that the Wage Board considered the commercial fishing industry part of the maritime industry; and that the Wage Board's determinations were unanimous.

There was, in substance, a considered determination that plaintiffs' duties and responsibilities most closely approximated those of personnel in the commercial fishing industry. And, it is not established that in reaching that determination, any reasonably comparable services in the maritime industry were ignored.

█ Whether, and under what circumstances, a lack of knowledge on the part of a Section 202(8) wage-fixing body, or any of its members, vitiate its actions need not be reached. On this record, it cannot be concluded that the Wage Board or the Regional Director, Region 3, acted arbitrarily or capriciously in utilizing a formula based on average hourly earnings of commercial fishermen in the large otter trawler fleet operating out of Boston in setting plaintiffs' wage rates for work at sea. Daniels v. United States, *supra;* Abbott v. United States, *supra; cf.* Amell v. United States, 390 F.2d 880, 885, 182 Ct.Cl. 604, 614 (1968), cert. denied, 393 U.S. 852, 89 S.Ct. 88, 21 L.Ed.2d 122 (1968).

## IV

Finally, plaintiffs contend that defendant has departed from a congressional mandate and requirement in the public interest that plaintiffs be paid overtime for all work in excess of 8 hours per day or 40 hours per week, and for all work performed on Saturdays, Sundays, or holidays. The theory seems to be that Section 23, Act of March 28, 1934, 48 Stat. 522, as amended, 5 U.S.C.

§ 673c (1964) [20] is "specifically made applicable" [21] to plaintiffs by Sections 102(c) and 203 of the Federal Employees' Pay Act of 1945, 59 Stat. 295, as amended, 5 U.S.C. §§ 902(c), 913 (1964).[22]

Briefly, Section 102(c), as amended, provided that the Federal Employees' Pay Act of 1945, "except sections 203 and 607" (the latter section here irrelevant) should not apply to employees whose basic compensation was fixed and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose. Section 203, as amended, provided that such employees should be entitled to overtime "in accordance with the provisions of section 23 of the Act of March 28, 1934 * * *."

In the Federal Employees' Pay Act of 1945, Congress drew a distinction between those employees covered by Section 102(c) and "vessel employees of the Department of Interior". Section 102(d), Federal Employees' Pay Act of 1945, 59 Stat. 295, 296, as amended, 5 U.S.C. § 902(d) (1964). The 1945 Act, "except *sections 606* and 607", does not apply to such vessel employees (emphasis supplied). Section 606, 5 U.S.C. § 946 (1964), provided that such employees "may be compensated in accordance with the wage practices of the maritime industry."

■ As the recent revision and codification of Title 5 and other acts of Congress in this area make clear, the distinction has been perpetuated. *E. g.,* 5 U.S.C. §§ 5102(c) (7), (8), 5541(2) (xi), (xii) (Supp. V, 1965–69). Upon a careful review of the statutory scheme, it is concluded that plaintiffs, vessel employees of the Department of the Interior, can claim no benefits under Sections 102(c) and 203 of the 1945 Act. *Compare* Panama Canal Co. v. Anderson,

312 F.2d 98 (5th Cir. 1963), cert. denied, 375 U.S. 832, 84 S.Ct. 43, 11 L.Ed. 2d 63 (1963).

V

Defendant's arguments that plaintiffs are estopped from asserting the claims sued upon by "their acquiescence and active participation in setting the very wage rates which they now attack",[23] and that the claims are barred by laches, need not be reached. *Cf.* Albright v. United States, 161 Ct.Cl. 356, 362–363 (1963); Abbott v. United States, *supra*; Parmenter v. United States, 125 Ct.Cl. 35 (1953).

---

20. Recodified in 5 U.S.C. §§ 5544(a), 5544 (a) (1), and 6102 (Supp. V, 1965–69).

21. Plaintiffs' Main Brief, p. 10.

22. Recodified in 5 U.S.C. §§ 5541(2) (xi), 5544(a) (first sentence), 5544 (a) (2) (3) (Supp. V, 1965–69).

