Janet L. ACKER, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 213–78, 399–78, 76–79, 266–79C, 580–79C, 57–80C, 137–80C and 543–82C.

United States Claims Court.

Oct. 30, 1984.

Stuart Rodney Wolk, Montville, N.J., for plaintiffs.

Wolk, Neuman & Bakshi and Arthur E. Neuman, Montville, N.J., of counsel.

John W. Showalter, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

MAYER, Judge.

These approximately 400 plaintiffs are now, or have been, employed as teachers in foreign areas by the Department of Defense Overseas Dependents Schools System (Dependents Schools). They claim living quarters allowances and travel agreements which have been denied them. The case is before the court on cross-motions for summary judgment.

### I. Background

Plaintiffs were recruited and hired overseas by Dependents Schools. They fall into a broad category of Dependents Schools teachers known as "local hires," and are distinguished from another category of teachers in the system who were recruited and hired in the United States known as "stateside hires." Generally, stateside hires receive living quarters allowances, separate travel agreements, and associated benefits during their period of employment solely because they were recruited and hired in the United States. Local hires generally do not receive living quarters allowances, travel agreements, or any associated benefits because, although United States citizens, they were hired in the for-

eign areas where they teach. The local hires and the stateside hires have similar living and working conditions and qualifications.

Receipt of a living quarters allowance means the government will provide housing, or a stipend so the recipient can pay for comparable housing if quarters are not available. Travel agreements cover the move to and from an overseas area, and travel of the recipients and their families back to the United States during the overseas tour. Other benefits are associated with these. For example, receipt of a quarters allowance and travel agreement could qualify one for a post differential of up to 25% more than the employee's pay to compensate for difficult conditions in a particular foreign area. So if plaintiffs were authorized living quarters allowances and travel agreements, they would receive the other benefits as well.

Dependents Schools grants a living quarters allowance subject to the provisions of Department of State Standardized Regulations (Standardized Reg.) §§ 031.1 and 031.-3, as implemented by Department of Defense Directive (Directive) 1400.13, *Salaries and Personnel Practices Applicable to Teachers and Other Employees of the DoD Overseas Dependents' Schools System,* ¶ IV.F.1.a (July 8, 1976), and Department of Defense Instruction (Instruction) 1418.1, *Payment of Differentials and Allowances in Foreign Areas,* ¶ III.B (Sept. 16, 1974).[1] A travel agreement is issued under the provisions of Department of Defense Joint Travel Regulations (JTR), vol. 2, ¶ C4002–3.

For purposes of the challenges to the regulations here, but not for entitlement under the regulations as they stand, the plaintiffs in these cases are assumed not to fall within the express provisions of Standardized Reg. § 031.12b and c, as modified by Instruction 1418.1, ¶ III.B, or JTR, vol. 2, ¶ C4002–3b, which in some instances al-

---

1. Effective January 1, 1982, Instruction 1418.1 was superseded by Department of Defense Civilian Personnel Manual 1400.25–M, Chapter 592, *Overseas Allowances and Differentials.* No sub-

stantive changes were made. Citation to Instruction 1418.1 will be continued here because most of the cases arose under it.

low locally hired employees to be granted a living quarters allowance and a travel agreement. Therefore, it is assumed that: (A) these plaintiffs were recruited and hired outside the United States, Puerto Rico, the Canal Zone, and the possessions of the United States, and prior to appointment they were not recruited by (1) the United States government, including the armed forces; (2) a United States firm, organization, or interest; (3) an international organization in which the United States government participates; or (4) a foreign government; (B) they were not required to move to their assignments as a condition of employment, for example, as a result of a management-generated transfer; and (C) they were not married to federally sponsored employees who died, were divorced or separated from the plaintiffs, departed the foreign area, or left a common domicile.[2]

It is stipulated that all plaintiffs were United States citizens at the time of their employment. They were recruited and hired by Dependents Schools in the foreign areas to teach where they were temporarily residing. Some of them are dependents of federally employed or military spouses; some were tourists who happened to be in the areas; some were students temporarily residing in the foreign areas; and some were in the foreign areas for other reasons.

## II. Issues And Discussion

### A. *Entitlement to travel agreements.*

Plaintiffs first say they are entitled to travel agreements regardless of whether they are stateside or local hires because they have had two or more years of continuous service.

 The general rule applicable to all federal employees is that those recruited and hired by the government may not be paid the expenses of traveling and moving to the first duty station. Federal Travel Regulations (FTR) ¶ 2–1.5e(1)(b). One ex-

ception, pertinent here, is that employees hired in the United States for service abroad are entitled to reimbursement for the cost of moving from the United States to the official overseas station. *Id.* ¶ 2–1.-5g(2). The employee typically enters into a travel agreement for a specific period, usually two years, and that permits the government to pay the expenses of traveling and moving overseas. *See* Directive 1400.13, ¶ IV.G. If that tour is extended for a similar period, the employee enters into a renewal agreement. This entitles him or her to a government paid round trip home leave from the duty station to the actual residence in the United States. *See* FTR ¶ 2–1.5.h. As a further general rule, persons already in the overseas area hired by the government, local hires, are not entitled to a travel agreement. JTR, vol. 2, ¶ C4002–3.

This so called point of hire distinction is at issue here. Essentially, plaintiffs ask the court to find an exception to these general rules for them. They believe that as overseas teachers they are a special class Congress intended to treat differently from the rest of the federal work force.

Relying on a statute specifically addressed to them, the Overseas Teachers Pay and Personnel Practices Act, 20 U.S.C. §§ 905, 906, plaintiffs made this same argument about the point of hire criterion as dispositive of their entitlement to living quarters allowances and post differentials in *Acker v. United States,* 620 F.2d 802, 223 Ct.Cl. 281 (1980) (*Acker I*). The court rejected the argument and held that Congress intended to treat plaintiffs the same as any other federal employee. The analysis there informs this court's consideration of the point of hire distinction as determinative of the same plaintiffs' rights to travel agreements. The Court of Claims said,

Congress' purpose in enacting the Overseas Differentials and Allowances Act is again clear from the legislative

---

**2.** The criteria for receiving travel agreements are not identical to those authorizing living quarters allowances. In general, however, a local hire may receive a travel agreement only if

he or she falls into categories similar to those described as authorizing living quarters allowances. *See* JTR, vol. 2, ¶ C4002–3b.

history. The Senate Report explicitly states that the bill was designed to establish uniformity of benefits to overseas employees regardless of agency. S.Rep. No. 1647, 86th Cong., 2nd Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin.News p. 3388. Plaintiffs argue that the Overseas Teachers Act controls exclusively their entitlement to benefits. Yet that Act's legislative history clearly shows an intent to provide teachers living quarters allowance and post differential *on the same basis as other employees, supra.* Furthermore, the only intent Congress showed in enacting the Overseas Teachers Act was to eliminate the Civil Service law problems and provide pay equivalent to domestic schools—not differentiate between cooks, physicists and teachers on the basic entitlement to compensatory benefits such as living quarters allowance and post differential. 620 F.2d at 805.

In our case, plaintiffs rely on three other statutes they believe entitle them to a travel agreement, 5 U.S.C. §§ 5722, 5724,[3] and 5728. As opposed to the availability of, but unsuccessful reliance on, the Overseas Teachers Pay and Personnel Practices Act in *Acker I*, these statutes are of general applicability to all federal employees and suggest no exception for teachers. Moreover, each of them specifically recites that an employee's rights to the benefits they provide are subject to such regulations as the President may prescribe. Plaintiffs, of course, accuse the regulations of being inconsistent with the statutes under which they were promulgated and therefore void.

▮ Plaintiffs are correct that executive regulations may not contradict the statutory provisions they implement. If they do, they cannot stand. *Sullivan v. United States,* 4 Cl.Ct. 70, 73 (1983), *aff'd,* 742 F:2d 628 (Fed.Cir.1984). But regulations of agencies entrusted with the obligation to implement the statutes are entitled to significant deference by the courts. The

Supreme Court has often cautioned that courts not interfere with executive action unless compelled to do so.

More than a half-century ago this Court declared that "where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this Court should be of opinion that his action was clearly wrong." *Bates & Guild Co. v. Payne,* 194 U.S. 106, 108–109 [24 S.Ct. 595, 596–597, 48 L.Ed. 894]. This admonition has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

*United States v. Shimer,* 367 U.S. 374, 381, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961). *See also Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *Sullivan,* 4 Cl.Ct. at 73; *Daniels v. United States,* 407 F.2d 1345, 1347, 187 Ct.Cl. 38 (1969).

This court approaches consideration of these regulations with even more circumspection because similar regulations were thoroughly considered in *Acker I* and not found wanting as they pertain to the allocation of closely related benefits based on the point of hire. If there is to be an incongruity among the benefits to which plaintiffs are entitled under these regulations, therefore, the reason for it must be compelling.

▮ There are two significant attributes of the statutes upon which plaintiffs rely. They are permissive, not mandatory, and they are interdependent. Section 5722, see Appendix, allows but does not require an agency to pay travel expenses for federal employees generally, and teachers specifi-

---

**3.** The pertinence of 5 U.S.C. § 5724 to the issues in these cases is not clear. However, the extent and limitations of section 5722 have explicitly

been incorporated by reference, *see* 5 U.S.C. § 5724(d), so the analysis of section 5722 also applies.

cally, appointed overseas. It also permits the President to prescribe regulations governing entitlement to these benefits, subject only to the requirements that employees receiving them agree in writing to remain in government service for a minimum period, and do indeed serve for that period.

Section 5728, see Appendix, authorizing government payment of travel expenses for vacation leave, is more mandatorily stated. But entitlement is conditioned upon satisfactory completion of an agreed period of service and the execution of a "new written agreement" before departing on leave. The requirement for a new written agreement presupposes an antecedent written agreement, and that is the one required by section 5722(b).

■ This brings us full circle to the question of whether regulations establishing point of hire as the trigger for entitlement to travel agreements are a permissible exercise of the executive discretion Congress authorized by section 5722. If they are, they control the applicability of both statutes to these plaintiffs.

The court is of the view that there is no more reason to upset the administrative scheme for the assignment of travel agreements than the Court of Claims found insufficient in *Acker I* to invalidate the living quarters and post differential allocation. The extra benefits provided stateside hires are viewed as recruitment and retention devices to secure the services of teachers in the far flung Dependents Schools. Persons willing to sign on in the United States subject themselves to posting wherever in the world their services are needed. Common sense suggests that the government will achieve greater recruitment and retention success if it offers employees reimbursement for the costs of the move overseas and back to the states upon completion of the tour, with periodic trips home at government expense if they agree to stay longer in their overseas posts.

Local hires have no need of these incentives. They have "voluntarily encountered any hardships and extra costs incident to their employment. Thus, they are unlike stateside hires who must be enticed overseas and compensated for their assignments to foreign posts.... Further, those teachers hired overseas are really not *assigned* to a foreign post in the sense their stateside counterpart is assigned." *Acker I*, 620 F.2d at 806. They were already abroad when hired. They make no commitment for a specific tour of duty as is required of stateside hires. They may come and go, teach or not, as they please. Nor are they subject to assignment to a post they do not choose. They may apply in an area generally perceived as favorable, such as Germany, England and Spain, and because there is often little competition for the local hire positions, they stand an excellent chance of selection even with minimal qualifications. Once selected they may convert to an indefinite appointment, assuming acceptable performance, and remain in the favorable location indefinitely.

For the positions filled from the United States, on the other hand, there is vigorous competition. Successful applicants must frequently accept assignment in hardship areas such as Cuba, Bahrain, Iceland or Korea, and will spend several years there before they can transfer to more favorable areas. And they must agree to a specific period of service.

So there are reasons of personal and even professional advantage why some teachers might choose to be local hires rather than run the risks of the stateside competition. They voluntarily make the choice irrespective of the availability of travel agreements. Others, of course, take advantage of the opportunity to teach when they are overseas because of less volitional reasons, such as accompanying a spouse assigned there on military orders or living there for business reasons. There is nothing improper, however, in limiting the advantages of a travel agreement to employees who instead incur the hardships of life abroad because of their assignment by the government. *See Acker I*, 620 F.2d at 806. It is emminently reasonable to implement the laws in such a way as to encourage the recruitment and retention of teach-

ers willing to serve as assigned for reliable periods of time. There is no incompatibility between sections 5722 and 5728 and the implementing regulations.

## B. *Entitlement through longevity.*

■ Plaintiffs next argue that because they have served beyond their probationary appointments they should receive living quarters allowances and travel agreements. Achievement of non-probationary status makes them "de facto" permanent Civil Service employees equal to stateside hires whose living and working conditions are the same and who receive these benefits.

Plaintiffs are asking the court to revisit the question of their entitlement to living quarters allowances *Acker I* put to rest. The decision there is the law of this case and is conclusive. *International Electronics Corp. v. United States,* 2 Cl.Ct. 570, 572, *aff'd mem.,* 727 F.2d 1120 (Fed. Cir.1983); *see also Northern Helex Co. v. United States,* 634 F.2d 557, 561, 225 Ct.Cl. 194 (1980). It said the point of hire criterion is valid and to conclude otherwise would be to treat these plaintiffs differently from all other federal employees, which was not the intention of Congress.

But plaintiffs say *Acker I* is limited to temporary employees; it was not intended to cover teachers who have been in the school system for several years. They say local hires who teach more than a year or two and are converted from probationary to non-probationary status should have living quarters allowances and travel agreements based on longevity and duration of employment, or because their working conditions are similar to stateside hires.

The court's review of *Acker I's* discussion of living quarters allowance and post differential entitlement, and the discussion in part II.A above about travel agreements, suggest no intention to treat teachers differently depending on the duration of their service or differently from all other federal employees whose entitlement to these benefits is set when they are hired. Neither the Court of Claims nor this court intended to

distinguish between teachers who were newly hired and those who had been teaching for several years. The papers before both courts informed them that some overseas teachers locally hired teach for more than one or two years. Moreover, acceptance of plaintiffs' position would create three classes of federal employees, new local hires who would not receive these benefits; non-probationary locally hired teachers who would; and all other non-probationary local hires who would not. *Acker I* rejected this concept.

Plaintiffs seize upon a passage in *Acker I* as recognition of their entitlement through longevity. The court said, "Exceptions do exist, however, granting these benefits to those hired abroad (or locally) who would not remain overseas except for their federal employment." 620 F.2d at 803. They misperceive the import of that quotation. The court was acknowledging exceptions to the point of hire criterion which permit some local hires to receive living quarters allowances and post differentials. *See* Standardized Reg. § 031.12; Instruction 1418.1, ¶ III.B. Nearly identical exceptions exist for the granting of travel agreements. JTR, vol. 2, ¶ C4002–3b. But the exceptions have nothing to do with longevity or length of service. They permit these benefits for certain appointees locally hired if they had been sent overseas originally by the United States government or certain United States interest organizations with entitlement to similar benefits. They also permit "compassionate" exceptions for local hires if a spouse receiving these benefits dies or departs the area permanently, a change in work location makes daily commuting to a common domicile unreasonable, or if there is a divorce or legal separation.

As is apparent, these regulatory exceptions cover unusual circumstances, including those in which a sponsoring spouse is no longer available. The local hire is given a living quarters allowance and travel agreement to make up for the benefits lost through circumstances beyond his or her control. The exceptions enhance the rea-

sonableness of the regulations. But merely teaching for more than a year or two is not a circumstance analogous to those, and failure to recognize an exception for it is not unreasonable.

*C. Discrimination.*

■ Under the Dependents Schools Administrative Reemployment Rights Program (ARRP), overseas teachers locally hired may resign, return to the United States for further training, and seek reemployment in the school system as a stateside hire. If they qualify and are rehired they may return to their overseas assignment with a living quarters allowance and the other benefits, although they may lose any seniority and tenure they acquired as a local hire.

The complaint about this program is couched in terms of discrimination between stateside hires and local hires, but is apparently as difficult to state as it is to comprehend. Defendant complains of a continuing inability to grasp the gravamen of this claim. The court agrees it is murky but accepts plaintiffs' characterization. They say, "The sum and substance of this argument is that if the career Local Hire teachers were granted the benefits the law provides, the ARRP program would be unnecessary. It only causes confusion, hinders retention of qualified teachers and adds to nonuniform administration of the benefits authorized by the enabling Acts and does not provide equally nor equitably for the costs and expenses and hardships of overseas living."

In other words, plaintiffs disagree with the regulatory policy that distinguishes among teachers on the basis of point of hire. But that argument has been addressed and retired in *Acker I* and by this court in parts II.A and B above. Any changes in the benefits allocation or improvements in the efficiency of the program are the business of the executive and legislative branches, not this one. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 195, 98 S.Ct. 2279, 2302, 57 L.Ed.2d 117 (1978).

*D. Vesting of status.*

■ Some of the plaintiffs had originally been employed as stateside hires or had fallen into a regulatory exception which authorized them to receive living quarters allowances and transportation agreements. They had resigned those positions and were subsequently brought back as local hires. They now claim that entitlement to allowances and travel agreements vested at the time of their initial employment and they should receive them now even as local hires.

■ There is no statute or regulation which permits permanent vesting of benefits in federal employees who once had them but later resigned. Therefore, for all intents and purposes *Acker I* fairly disposed of this issue by holding that plaintiffs are to be treated the same as any other federal employee. *See* 620 F.2d at 805. Review of regulations generally applicable to federal employees shows that, while not explicitly rejecting the vesting concept, when read in a commonsensical way they determine employees' status at the time and each time they are hired.

One regulation, covering the exceptions to the local hire rules, says the time to determine a locally hired employee's actual residence is the date of the appointment. Whether he or she had previously been hired stateside is irrelevant. It says,

> An initial agreement will be negotiated with only the following locally hired employees provided they are able, *at the time of appointment or assignment,* or at the time they lose eligibility for return transportation, to establish to the satisfaction of the appointing official, bona fide place of actual residence in the United States but outside the geographical locality of the post of duty....

JTR, vol. 2, ¶ C4002–3b. (Emphasis added). Another regulation shows that after a break in service a federal employee is treated as a new appointee and retains no lingering vesting of once acquired rights. FTR ¶ 2–1.5e(1)(a) says,

New appointee includes not only individuals when first appointed to Government service *but also individuals appointed after a break in service* except that employees separated as a result of reduction in force or transfer of function may be treated as transferees instead of new appointees.... [Emphasis added.]

Finally, Instruction 1418.1, ¶ III.B.1.a, states, "Eligibility for quarters allowance will be determined at the time of hire and redetermined any time pertinent changes in circumstances occur." It says nothing about the federal employee's prior status as either a stateside or local hire, and the language leaves no room for recognition of a vested right. In keeping with *Acker I's* call for uniformity of treatment among all federal employees, the court concludes there is no basis for finding a special right of permanent vesting of stateside hire status in these plaintiffs.

### E. Voluntary relinquishment of spouses' benefits.

 Among the plaintiffs are some who were married to uniformed military or civilian employees of the government who had once received living quarters allowances and travel agreements but retired from government service and no longer receive them. Plaintiffs say that with the loss of these benefits upon the retirement of their spouses they should receive them in their own right.

As discussed in part II.B above, the regulations do permit compassionate exceptions to the rule that local hires are not entitled to living quarters allowances and travel agreements. In summary, Instruction 1418.1, ¶ III.B, grants these local hires benefits they enjoyed when living with a spouse who was entitled to them if that spouse dies, is divorced, is legally separated, departs permanently, or lives too far away to maintain a common domicile. Plaintiffs see their situations when their sponsors retire in the foreign area as the same as those exceptions. They see no reason for a difference in treatment.

There is, however, a significant difference between the exceptions permitted and the one plaintiffs seek. The exceptions to the point of hire criterion in Instruction 1418.1 attempt to ameliorate the harsh consequences of the removal of a spouse beyond the control of the locally hired employee. In our case, when a spouse retires and the couple voluntarily decides to remain abroad, the event is not uncontrollable. They have merely chosen a particular lifestyle which it is not unreasonable for the government to decline to subsidize.

### F. Statute of limitations.

Finally, there is a group of plaintiffs who claim that Dependents Schools wrongfully denied them living quarters allowances and travel agreements to which they were entitled by the regulations as they stand. The difficulty is that the alleged wrongful denials occurred more than six years before they brought suit. These plaintiffs fall variously into the following situations.

1. Prior to March 25, 1971, employees classified as students or tourists at the time of hire were entitled to living quarters allowances, travel agreements, or both. Employees who were determined to be eligible for these allowances at that time retain their eligibility as long as they are continuously employed in a foreign area. *See* Standardized Reg. § 031.12. Dependents Schools determined that these plaintiffs were not in a study or travel status at the time of hire, and therefore were ineligible for the benefits. Plaintiffs contest these determinations.

2. Dependents Schools made a determination that these plaintiffs were local hires and not eligible for living quarters allowances and travel agreements. Plaintiffs counter that they should have been treated as if they were stateside hires.

3. Local hires who had been in substantially continuous employment with a United States agency or United States interest agency or organization, are entitled to living quarters allowances, travel agreements, or both. *See* Standardized

Reg. § 031.12b; Instruction 1418.1, ¶ III. B.1.b.(2)(b); JTR, vol. 2, ¶ C4002–3b. Plaintiffs contest Dependents Schools' determination that they did not have this status at the time of hire.

4. Local hires who are transferred to another location at the behest of management are entitled to living quarters allowances and travel agreements from the time of their transfer. *See* Standardized Reg. § 031.12c; Instruction 1418.1, ¶ III. B.1.d. Dependents Schools made a determination that plaintiffs' transfers were not "management generated," which plaintiffs contest.

5. Local hires whose spouses received living quarters allowances and travel agreements are entitled to these allowances in the event of a spouse's death, divorce, legal separation, departure of the spouse from the area, or change in either spouse's work location so that daily commuting to a common domicile becomes unreasonable. *See* Instruction 1418.1, ¶ III.B.1.b(1); JTR, vol. 2, ¶ C4002–3b. Plaintiffs contest Dependents Schools' determination that they do not fall within these categories and are therefore not eligible for the benefits.

"A claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic Steamship Co. v. United States*, 165 Ct.Cl. 217, 225 (1964). It is barred by 28 U.S.C. § 2501 if the complaint is not filed within six years thereafter. Here, plaintiffs' claims first accrued on the dates Dependents Schools made the determinations that they were ineligible for living quarters allowances and travel agreements. Because this was more than six years before the filing of these suits, the claims would ordinarily be barred by the statute of limitations.

The Court of Claims, however, fashioned an exception to this rule. It held that certain claims against the government will be considered to be "continuing" in nature, accruing anew each time a payment is due. "This court has long adhered to the view

that a suit for compensation due and payable periodically is, by its very nature, a 'continuing claim' which involves multiple causes of action, each arising at the time the Government fails to make the payment alleged to be due." *Burich v. United States*, 366 F.2d 984, 986, 177 Ct.Cl. 139 (1966). Therefore, if these claims are continuing, plaintiffs are entitled to recover the allowances accrued during the six years immediately preceding the filing of suit, even if the claims originally arose more than six years before.

*Friedman v. United States*, 310 F.2d 381, 384–85, 159 Ct.Cl. 1 (1962), reiterated the elements of a continuing claim.

(a) Congress had not entrusted an administrative officer or tribunal with the *determination* of the claimant's eligibility for the particular pay he sought; (b) the cases turned on pure issues of law or on specific issues of fact which the court was to decide for itself (i.e., Congress had not established any administrative tribunal to *decide* either the factual or the legal questions); and (c) in general the cases called upon the court to resolve sharp and narrow factual issues not demanding judicial evaluation of broad concepts such as "disability" (concepts which involve the weighing of numerous factors and considerations as well as the exercise of expertise and discretion).

And it is essential that there also be no "uncertain, undiscovered, or disputed facts." *Roberts v. United States*, 151 Ct.Cl. 360, 363 (1960); *see also Waite v. United States*, 230 Ct.Cl. 731, 733–34 (1982).

Plaintiffs satisfy two *Friedman* criteria. There is no administrative machinery set up for the resolution of their claims and the law is clear. Whether or not the factual issues are sufficiently precise and narrow will depend primarily on whether the dispositive facts are uncertain, undiscovered, or disputed. Therefore, it is necessary to know what information was required to make each determination and whether it still exists.

Plaintiffs say the information used in determining whether they fell within any of the exceptions to the point of hire criterion is still in defendant's files. However, the government responds that "[t]his is highly unlikely unless the plaintiff contested the determination at that time. Otherwise, there is virtually certain to be nothing other than the mere indication that the plaintiff was employed as a local hire without being granted LQA." [4] What this shows is disagreement over the contents of the files, which the parties apparently have not yet reviewed sufficiently to state with certainty what is in them. In this posture there exists a dispute over a material fact, *see* RUSCC 56, and the court cannot confidently rule on either party's motion for summary judgment. This disagreement must be resolved before it can be known whether the facts will support the continuing claim exception.

For example, plaintiffs say that whether one was or was not a tourist is an easily resolvable factual issue. However, *Trifunovich v. United States*, 196 Cl.Ct. 301 (1971), is a lengthy account of the information needed to make this determination. Absent any stipulated criteria, inquiry into an employee's bank accounts, voter registration, travel itinerary, and other factors is necessary. If this is the case here, plaintiffs will not have the benefit of the continuing claim exception.

Determination of whether a transfer was "management generated" likely will require internal correspondence of the agency which may or may not still exist. Determining whether a spouse died may be relatively simple, but finding documentary evidence of separation could be more difficult. Whether or not an employee was erroneously classified as a local hire or previously had been employed by the United States or a United States interest organization are the types of situations for which documentary evidence could permit reevaluation, but this is no assurance the evidence still exists.

The statute of limitations is aimed at preventing "factual issues from being tried too long after the events occurred ... at a time when the past cannot be reconstructed with any pretense of accuracy." *Friedman*, 310 F.2d at 401. "[T]he purpose of the statute of limitations is not defeated or undermined in entertaining claims, the operative facts of which first occurred over six years ago, as long as the facts necessary to a determination of those claims are before us with certainty, and not obscured by the dust of years." *Roberts*, 151 Ct.Cl. at 363. But the continuing claim exception is to be strictly applied.

With this in mind, the court remands these claims to the parties for such activities as will permit their prompt resolution case by case. Once the records are reviewed, which, if any, of plaintiffs' claims are "continuing" and which are barred by the statute of limitations should be clear. If some available records show entitlement, the court expects defendant will forthwith resolve the claims of affected plaintiffs administratively. If the claims of others cannot be resolved without excursions into uncertain records, or testimony, that is to say if they depend on the resolution of uncertain, undiscovered or disputed facts, they are barred by the statute of limitations and will be dismissed. In the meantime, as to this issue the motions for summary judgment must be denied.

### III. Conclusion

Accordingly, plaintiffs' motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted in part and denied in part, and the parties will proceed with the resolution of the remaining claims consistent with this opinion and the accompanying order.

It is so ORDERED.

### Appendix

The provisions of 5 U.S.C. § 5722 at issue here are as follows:

(a) Under such regulations as the President may prescribe and subject to

---

**4.** The only indication in the regulations of what evidence is retained is a reference in JTR, vol. 2, ¶ C4004–2c, to documentation about the actual place of residence.

subsections (b) and (c) of this section, an agency may pay from its appropriations—

(1) travel expenses of a new appointee and transportation expenses of his immediate family and his household goods and personal effects from the place of actual residence at the time of appointment to the place of employment outside the continental United States; and

(2) these expenses on the return of an employee from his post of duty outside the continental United States to the place of his actual residence at the time of assignment to duty outside the United States.

(b) An agency may pay expenses under subsection (a)(1) of this section only after the individual selected for appointment agrees in writing to remain in the Government service for a minimum period of—

(1) one school year as determined under chapter 25 of title 20, if selected for appointment to a teaching position, except as a substitute, in the Department of Defense under that chapter; or

(2) 12 months after his appointment, if selected for appointment to any other position;

unless separated for reasons beyond his control which are acceptable to the agency concerned. If the individual violates the agreement, the money spent by the United States for the expenses is recoverable from the individual as a debt due the United States.

(c) An agency may pay expenses under subsection (a)(2) of this section only after the individual has served for a minimum period of—

(1) one school year as determined under chapter 25 of title 20, if employed in a teaching position, except as a substitute, in the Department of Defense under that chapter; or

(2) not less than one nor more than 3 years prescribed in advance by the head of the agency, if employed in any other position;

unless separated for reasons beyond his control which are acceptable to the agency concerned. These expenses are payable whether the separation is for Government purposes or for personal convenience.

In pertinent part 5 U.S.C. § 5728 states:

(a) Under such regulations as the President may prescribe, an agency shall pay from its appropriations the expenses of round-trip travel of an employee, and the transportation of his immediate family, but not household goods, from his post of duty outside the continental United States to the place of his actual residence at the time of appointment or transfer to the post of duty, after he has satisfactorily completed an agreed period of service outside the continental United States and is returning to his actual place of residence to take leave before serving another tour of duty at the same or another post of duty outside the continental United States under a new written agreement made before departing from the post of duty.